

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | No. 08-15-00002-CR |
| Appellant, | § | Appeal from the |
| v. | § | 409th District Court |
| DANIEL VILLEGAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 940D09328) |
| | § | |

## **O P I N I O N**

In this interlocutory appeal, the State seeks to overturn the trial court's pretrial order suppressing thirty-seven statements made during recorded telephone conversations between a prison inmate and his friends and family members while the inmate's post-conviction writ of habeas corpus attacking his capital murder conviction was pending in district court. The State contends the calls should be admitted at the inmate's retrial for capital murder because they show he was conscious of his own guilt and that he conspired to tamper with witnesses and a judge during the habeas proceedings in order to wrongfully gain his freedom. The inmate, now free, counters that the State paints the calls in a false light and that his efforts to secure witnesses for the writ hearing were simply done to vindicate his own innocence.

We do not decide which characterization is correct, nor do we pass on guilt or innocence

today. Instead, we are called on to answer one simple yet multifaceted question: Did the trial court exceed its discretionary authority by blocking the State from using several hours of recorded prison phone calls at the inmate's retrial before trial even began? We conclude the trial court did not abuse its discretion in determining admissibility before trial or in issuing a preliminary order excluding the phone calls from any retrial. Accordingly, we affirm the trial court's order.

## BACKGROUND

At the outset, we acknowledge that the controversial case underlying this State's appeal has received widespread media attention, both locally and nationally. We are not blind to it, but we are also not swayed by it. Our fidelity—unmoved by sympathy, politics, or public opinion—lies solely with the law, and as is our duty, we limit ourselves to the record before us, to the legal arguments raised by the parties, and to the standard of review that defines the relationship between this Court and the court below.

This interlocutory appeal arises from the State's third attempt to try Daniel Villegas for the capital murder of Robert England and Armando Lazo, who both died in a 1993 drive-by shooting on Electric Street in Northeast El Paso. The State asserts that Villegas, then sixteen years old, was the gunman. Villegas' first trial in 1994 ended in a mistrial, with the jury hung 11-1 in favor of conviction. His second trial in 1995 ended in Villegas' conviction for capital murder and a life sentence. This Court affirmed his conviction on direct appeal. *Villegas v. State*, No. 08-95-00272-CR (Tex.App. – El Paso July 10, 1997, no pet.) (not designated for publication).[1]

In 2009, Villegas filed an application for a writ of habeas corpus, hoping to overturn his conviction. Villegas contended that his counsel at the second trial had rendered ineffective

---

[1] This opinion is not available through Westlaw.

2

assistance by failing to investigate other leads. Villegas later amended his petition to assert he also had new evidence proving he was actually innocent of capital murder. The application was initially assigned to Judge Mary Anne Bramblett, who had presided over Villegas' second trial in 1995, but was later reassigned after she voluntarily recused herself. In 2012, Judge Sam Medrano of the 409th District Court recommended granting Villegas a writ of habeas corpus and overturned his conviction, finding that Villegas had received ineffective assistance of counsel during his 1995 trial and that Villegas was actually innocent of capital murder. The Court of Criminal Appeals affirmed the writ on ineffective assistance of counsel grounds, but did not find that the new evidence clearly and convincingly showed that Villegas was actually innocent of the crime. Accordingly, the 1995 conviction was overturned but no acquittal was rendered, clearing the way for the State to try Villegas for a third time. *See Ex parte Villegas*, 415 S.W.3d 885, 886 (Tex.Crim.App. 2013) (per curiam). Retrial is currently pending in the 409th District Court with Judge Medrano presiding.

John Mimbela, owner of Mimbela Construction and the stepfather of Villegas' nieces, spearheaded Villegas' successful post-conviction efforts for relief. In the upcoming third trial, the State seeks to use recordings of numerous telephone calls that Villegas made from prison to Mimbela and Villegas' mother, father, sister and friends, at or around the time Villegas' habeas corpus application was pending. The State generally alleges that these recordings show that during the post-conviction proceedings, Villegas made several admissions of guilt, and that Villegas and Mimbela conspired to tamper with multiple witnesses and attempted to initiate an ex parte communication with Judge Bramblett while she was presiding over the habeas corpus application. In the State's view, these actions show Villegas' consciousness of guilt and are admissible as substantive evidence at trial during the State's case-in-chief.

3

Although Villegas successfully filed a motion to suppress a confession he gave in 1993 to an El Paso Police Department detective,[2] Villegas never technically moved to suppress the prison recordings at issue in this appeal. Rather, an understanding that the trial court would rule on the admissibility of the recordings appears to have grown organically from a series of hearings, off-the-record discussions in chambers, and private conferences between Villegas and the State as discovery in the case moved forward. The issue of a potential pretrial hearing on admissibility arose after the State disclosed a second batch of CDs containing several hundred hours of prison recordings, and Villegas moved for a continuance of further evidentiary hearings in order to analyze the recordings. During a hearing on the motion for continuance, Villegas' counsel represented that the trial court had previously asked Villegas and the State to confer about the first batch of prison telephone calls to determine if the parties could agree on what was actually being said in the recordings. The trial court confirmed that this had been the court's previous request and clarified that it was primarily concerned with any disputes over exactly what was said in the recordings. Villegas' counsel then asked the trial court whether "it would like for the district attorney's office to try to narrow down the voluminous calls into what they actually think might be relevant and material and they think is necessary?" The court responded that:

> If both parties agree to those things, absolutely. If all parties are saying every CD we have heard we believe you need to rule on, then the evidentiary hearing is going to last, from what I can tell, twelve weeks without any other hearings this court is going to have. So am I prepared to do that? The Court is always prepared to do that. Does anybody in this room want to do that? I hope not, but I am not the attorneys representing either side. And so if it can be worked out, this Court will not only be grateful, but appreciative. If it can't, it can't.

Although the State objected to the granting of a continuance at this hearing, the evidentiary arrangement proposed in this colloquy drew no on-the-record objection from the State.

---

[2] In suppressing the confession, the trial court found Villegas credible and concluded his confession was the constitutionally unreliable product of coercion. The State did not appeal that suppression order.

Thereafter, Judge Medrano scheduled a pretrial hearing on a "Motion to Determine Relevancy of Recorded Conversations" apparently raised on his own motion. At the initial hearing, however, Judge Medrano learned that his name had been raised in certain recorded discussions between Villegas and Mimbela, and he *sua sponte* suspended the proceedings and referred the case to the presiding judge of the Sixth Administrative Judicial Region to determine whether he needed to be recused due to any appearance of impropriety and to determine whether the conversations between Villegas and Mimbela pertaining to him would be admissible at trial. Following a hearing, Presiding Judge Stephen Ables ruled that Judge Medrano could continue to preside over Villegas' retrial and issued an order suppressing the telephone conversations pertaining to Judge Medrano as irrelevant.[3] Later, after holding a hearing, Judge Medrano issued an "Order Regarding State's Designated Phone Calls" that excluded a majority of the remaining telephone call recordings from use at retrial.[4]

## DISCUSSION

The State and Villegas have raised numerous arguments in this appeal. By our count, the State alone has raised thirty-eight issues. For simplicity's sake, we will address jurisdiction and certain global objections first, before assessing the admissibility of the individual statements in the recorded telephone calls.

## I.
## Jurisdiction

---

[3] The State does not challenge the exclusion of the phone calls relating to Judge Medrano in this appeal, but does reference material raised during Judge Ables' hearing. Because an order sealing the record of that hearing is still in effect, we will reference materials from that hearing only as necessary. While this interlocutory appeal was pending and after we had issued a stay order, the trial court entered an order sealing the remainder of the telephone recordings. We struck down that seal order as violating our stay. *State v. Villegas*, No. 08-15-00002-CR, 2015 WL 1477748, at *2 (Tex.App. – El Paso Mar. 23, 2015, no pet.) (op. on motion, not designated for publication). Judge Ables' sealed order remains in effect.

[4] The trial court deferred ruling on a call between Villegas and his ex-girlfriend concerning potential witness Celia Fierro. The State alleges this phone call corroborates an attempt by Mimbela to bribe Fierro to testify in a certain way. That ruling is not at issue in this appeal.

5

As a threshold matter, Villegas urges us to dismiss the State's appeal for want of jurisdiction, contending that the District Attorney for the 34th District, Jaime Esparza, failed to personally certify that this interlocutory appeal was not made for purposes of delay and that the evidence suppressed was of substantial importance to the case, as required by the interlocutory appeal statute. *See* TEX. CODE CRIM. PROC. ANN. art. 44.01(a)(5) (West Supp. 2016) (setting conditions for a State's interlocutory appeal of a pretrial motion to suppress). The crux of Villegas' argument is that while Esparza personally signed the notice of appeal, the body of the notice of appeal above his signature states "The State certifies" instead of "I, Jaime Esparza, certify." According to Villegas, we cannot reasonably infer the *personal* attestation by Mr. Esparza, which is required for this Court to exercise its interlocutory appellate jurisdiction.

Villegas previously raised this same argument in a motion to dismiss he filed in this appeal. In a published opinion, we denied the motion and concluded that we possess interlocutory appellate jurisdiction, holding that the case law does not strictly require the District Attorney to use the phrase "I certify" in the body of the notice of appeal so long as it is apparent that "the elected prosecutor vouches for the two necessary facts." *State v. Villegas*, 460 S.W.3d 168, 169-70 (Tex.App. – El Paso 2015, no pet.). Villegas asks us to reconsider our own previous decision, citing several cases handed down after the Court of Criminal Appeals rendered its decision in *State v. Redus*, 445 S.W.3d 151 (Tex.Crim.App. 2014), which this Court previously interpreted and applied.[5] We have reviewed the cited authority and see no compelling reason to

---

[5] *See, e.g., State v. Chapa*, No. 01-13-01069-CR, 2014 WL 5573430, at *1 (Tex.App. – Houston [1st Dist.] Oct. 30, 2014, no pet.) (per curiam) (mem. op., not designated for publication); *State v. Rodriguez*, No. 14-13-00766-CR, 2014 WL 5309661, at *1 (Tex.App. – Houston [14th Dist.] Oct. 16, 2014, no pet.) (per curiam) (mem. op., not designated for publication); *State v. Moore*, No. 14-13-01009-CR, 2014 WL 5309874, at *1 (Tex.App. – Houston [14th Dist.] Oct. 16, 2014, no pet.) (per curiam) (mem. op., not designated for publication). In each of these cases, the State voluntarily moved to dismiss its own appeal for failure to comply with the strict terms of the interlocutory appeal statute. The First Court dismissed *Chapa* without comment. The Fourteenth Court in *Rodriguez* and *Moore* confirmed that the State's appellate certification was deficient without specifying why.

revisit our prior decision. We again conclude that jurisdiction is proper in this Court.

## II.
## Evidentiary Issues

We next turn to the heart of this case and assess whether the trial court abused its discretion in excluding the prison phone call recordings.

## A.
## State's Global Objection: Pretrial Exclusion Improper

We start with the State's global argument for overturning the suppression order in its entirety. In Issue One, the State maintains that the trial court abused its discretion *ab initio* by forcing the State to prove the admissibility of the prison recordings at a pretrial hearing, arguing that the true value of its evidence can be properly assessed only within the dynamic context of trial. On this record, we cannot say that Judge Medrano abused his discretion by preliminarily resolving the admissibility of the multiple hours of telephonic recordings before trial.[6]

The State recognizes that in general the trial court has the discretion to conduct a pretrial hearing on preliminary matters, including the admissibility of evidence. *See State v. Hill*, __S.W.3d__, 2016 WL 5113974, at **10, 12 (Tex.Crim.App. Sept. 21, 2016) (trial courts have "discretionary authority to hold pretrial evidentiary hearings on preliminary matters that can, and should be, resolved expeditiously"); TEX. CODE CRIM. PROC. ANN. art. 28.01(1)(6) (West 2006)

---

[6] We operate under the assumption that the State properly preserved this point, although as Villegas points out, the State did not object on the record to the hearing until *after* the trial court had already excluded all the evidence. *See Patterson v. State*, 353 S.W.3d 203, 212 (Tex.App. – San Antonio 2011, pet. ref'd) (after-the-fact objections are insufficient to preserve error). During the admissibility hearing, the prosecutor stated that the State had previously informed the trial court in chambers several months before that it believed the hearing was "improper," to which the trial court made no response. However, the only formal objection on the record was the objection made after the trial court had already made all its admissibility rulings. The State asserts that the challenge to the pretrial hearing was preserved as shown in a reporter's record, which is subject to Judge Ables' seal order. However, the prosecutor made this "objection" only in a soliloquy to the court reporter after Judge Medrano had already recused himself, had left the courtroom, and had referred the case to Judge Ables for a recusal review. We fail to see how lodging an objection to an empty bench preserves a point of error. *See Lankston v. State*, 827 S.W.2d 907, 909 (Tex.Crim.App. 1992) (to avoid appellate forfeiture of complaint, party must let the trial judge know what he wants "at a time when the trial court is in a proper position to do something about it").

7

(permitting a trial court to hold a pretrial hearing on motions to suppress evidence); *State v. Medrano*, 67 S.W.3d 892, 901 (Tex.Crim.App. 2002) (recognizing that a motion to suppress under article 28.01 is one in which a party claims that certain evidence should not be admitted at trial for a constitutional, statutory, evidentiary or procedural reason); *see also Cox v. State*, 843 S.W.2d 750, 752 (Tex.App. – El Paso 1992, pet. ref'd) (applying abuse of discretion standard in reviewing challenge to propriety of pretrial hearing in which defendant had to prove the existence of a conspiracy to obtain the admission of statements under hearsay exception). A trial judge may also "use his discretion in deciding what type of information he considers appropriate and reliable in making his pre-trial ruling." *Hill*, 2016 WL 5113974, at *11 (quoting *Ford v. State*, 305 S.W.3d 530, 539 (Tex.Crim.App. 2009)). An abuse of discretion does not occur unless the trial court's decision falls outside the zone of reasonable disagreement. *Id.* at *12, n. 34.

In challenging the trial court's decision to decide the admissibility of the recordings pretrial, the State relies chiefly on *State v. Mechler*, in which the Court of Criminal Appeals indicated that in a pretrial Rule 403 exclusion case, "a trial court often will not have enough information before it to adequately apply these factors and assess whether the contested evidence's probative value is substantially outweighed by its prejudicial effects." 153 S.W.3d 435, 440 (Tex.Crim.App. 2005). While it is apparent that *Mechler* does not foreclose trial courts from ruling on evidentiary issues pretrial, we agree with the State that *Mechler* contemplates there may be situations in which a trial court cannot conduct a pretrial Rule 403 balancing test because it does not have enough information before it. We disagree that this case represents one of those situations.

The State relies heavily on Judge Cochran's observation in her *Mechler* concurrence that

"it is rare that Rule 403 is an appropriate basis for the pretrial exclusion of evidence because the trial judge cannot ascertain potential relevance or the impact of countervailing factors without 'a virtual surrogate for a trial record.'" *Mechler*, 153 S.W.3d at 442-43 (Cochran, J., concurring). The State also directs us to the case law cited in the concurrence urging restraint in the use of pretrial admissibility hearings absent such records.[7] We find no Texas case law, however, suggesting that a "virtual surrogate for the record" is necessarily required before a trial court may rule on the admissibility of evidence pretrial. Regardless, this case has been tried twice before, and extensive testimony was taken during the habeas proceedings. Consequently, even if a virtual surrogate for the record were required, the trial court here had not one, but three virtual surrogates in the form of the judicially-noticed records from Villegas' last two trials, as well as extensive testimony from the writ hearing over which Judge Medrano personally presided.[8] The facts of this case have been tread and retread several times over.

The State asserts that even with three predictive virtual surrogates for the record, the trial court should not have ruled on admissibility pretrial because now that Villegas' confession has been suppressed, the upcoming retrial will involve different strategies from both the prosecution and the defense, as well as new witnesses. Without the benefit of the anticipated new testimony, the State argues, admissibility is impossible to determine. However, we note that the State never moved for a continuance of the exclusion hearing to obtain any such evidence and provided the

---

[7] *See Spain v. Gallegos*, 26 F.3d 439, 453 (3d Cir. 1994); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co.*, 998 F.2d 1224, 1240 (3d Cir. 1993); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 747 (3d Cir. 1994); *see also State v. Crumb*, 649 A.2d 879, 884 (N.J. Super. Ct. App. Div. 1994) (interpreting New Jersey's version of Rule 403 and stating "[p]re-trial motions on evidence issues should be granted only sparingly").

[8] The State argues that the trial court improperly considered the records of the previous trials as virtual surrogates in reaching its evidentiary rulings because the records are hearsay. The State did not object when the trial court took judicial notice of those records, and in any event, the trial court is not bound by the Rules of Evidence, save for those involving privilege, in making its threshold evidentiary determinations. *See* Tex. R. Evid. 104(a) ("the court is not bound by evidence rules, except those on privilege" in deciding preliminary questions whether evidence is admissible); *Hubert v. State*, 312 S.W.3d 554, 558 n.3 (Tex.Crim.App. 2010) ("we have held that the Rules of Evidence do not apply in a pre-trial suppression hearing"); *Granados v. State*, 85 S.W.3d 217, 228 (Tex.Crim.App. 2002).

9

trial court with only general allusions to what this purported new testimony would entail. We also note that with respect to the purported admissions of guilt in particular, the admissibility of these standalone conversations can be largely determined without reference to other outside evidence. Further, the purported inculpatory remarks and witness tampering statements the State seeks to admit arose in a specific context during a discrete period of time—namely, between Villegas and family members during jailhouse phone calls in and around the time of Villegas' post-conviction habeas corpus writ application was pending, which we note is nearly two decades removed from the events alleged in the indictment. And, as in the trial court, the State never makes clear on appeal how any new witness testimony could arguably change the admissibility analysis, particularly in light of an extensive record already thrice developed at trial and in habeas.

We do not discount the possibility that the ultimate balance may change as trial goes on, and of course, the trial court is always free to revise its rulings on a motion to suppress at any time. As we have previously noted, the Court of Criminal Appeals in *Black v. State*, 362 S.W.3d 626 (Tex.Crim.App. 2012), and the case discussed approvingly therein—*Montalvo v. State*, 846 S.W.2d 133 (Tex.App.–Austin 1993, no pet.)—recognized that a pretrial motion to suppress evidence is nothing more than a specialized objection to the admissibility of that evidence. *Davis v. State*, No. 08-15-00033-CR, 2016 WL 4126020, at *5 (Tex.App. – El Paso Aug. 3, 2016, pet. ref'd) (not designated for publication); *Black*, 362 S.W.3d at 633; *Montalvo*, 846 S.W.2d at 137. Accordingly, a ruling on a motion to suppress is interlocutory in nature, which a trial court can reconsider and revise in its discretion at any time. *Davis*, 2016 WL 4126020, at *5; *Black*, 362 S.W.3d at 633; *Montalvo*, 846 S.W.2d at 138. Therefore, even mid-trial, a trial court has the discretionary authority to reopen a hearing on a motion to suppress to allow the

10

State to present additional evidence addressing the trial court's interlocutory ruling on the motion to suppress. *Davis*, 2016 WL 4126020, at \*5; *Black*, 362 S.W.3d at 635.

We conclude the trial court did not abuse its discretion in preliminarily ruling on admissibility of this evidence pretrial, given the extensive development of previous records, and given that the evidence in controversy largely speaks for itself. Simply put, while a pretrial evidentiary ruling by its very nature will always be somewhat speculative, the record here does not show that the trial court abused its discretion in rendering its pretrial rulings.

The State's remaining argument against pretrial suppression rests primarily on fairness grounds. The State complains that the pretrial hearing improperly required the State to put on a "dress rehearsal" of its case-in-chief, and argues that under *Woods v. State*, the trial court is forbidden from imposing a burdensome "mini-trial" admissibility hearing on the State. *See* 153 S.W.3d 413, 414-15 (Tex.Crim.App. 2005). Nothing in *Woods*, however, excuses the State from complying with its obligation to establish the necessary predicates for admissibility simply because the burden of compliance would turn the admissibility hearing into a "mini-trial." Rather, *Woods* deals with a specific subset of fact-specific, idiosyncratic suppression orders so enmeshed with the merits of the case-in-chief that the suppression question could not be resolved pretrial, either because it would require the trial court to make a finding that evidence underpinning an element of the offense was legally insufficient (*i.e.*, implicitly rule on guilt or innocence), or because it would require the trial court to make a credibility determination that necessarily renders an element of the crime legally insufficient. *See id*. at 415; *see also State v. Iduarte*, 268 S.W.3d 544, 551-52 (Tex.Crim.App. 2008) (in aggravated assault of peace officer case, suppression of officer's testimony was improper where the evidentiary issue turned on the trial court's finding that police officer's testimony that defendant pointed a gun at him was not

credible).

The State is correct that it cannot be forced to put on a "mini-trial" as to Villegas' ultimate guilt or innocence at a suppression hearing. *Woods*, 153 S.W.3d at 415 ("We now conclude that the statutes authorizing pre-trial proceedings do not contemplate a 'mini-trial' *on the sufficiency of the evidence to support an element of the offense*.") (emphasis added); *see also State v. Garcia*, No. 08-10-00362-CR, 2012 WL 3025924, at \*\*3-4 (Tex.App. – El Paso July 25, 2012, pet. ref'd) (not designated for publication) (trial court erred where it used suppression hearing as pretext to rule on ultimate merits of the case instead of the limited issue of probable cause). But *Woods* does not absolve the State from establishing the admissibility of evidence pretrial simply because it could involve a burdensome process of establishing predicates at an evidentiary hearing. *See State v. Esparza*, 413 S.W.3d 81, 86 (Tex.Crim.App. 2013) (noting in scientific evidence context that upon objection, the State can "be made to satisfy" its evidentiary burden of proving admissibility "[w]hether at trial or in a pretrial hearing"); *accord Cox*, 843 S.W.2d at 752 (hearsay proponent could be made to establish in pretrial proceeding the predicate for admission under conspiracy exception to hearsay).

The State bears the burden of proof on admissibility, and the trial court wields substantial discretion in how it chooses to run its docket, and nothing on this record prevented the trial court from ruling pretrial on the admissibility of evidence, provided the trial court did not find an element of the crime legally insufficient in its suppression order or otherwise made preclusive, outcome-determinative, credibility determinations. And, as we explain below, there is no indication the trial court made credibility determinations in weighing the evidence, or that it made pretrial findings that would acquit Villegas by suppressing the evidence. Nor did the court purport to resolve the entire case with its suppression order or make any findings that would go

12

to guilt or innocence. Rather, the trial court's ruling was purely evidentiary and limited to a certain, self-contained subset of evidence put into context by two trial records and a habeas proceeding. As such, the ruling complies with *Woods* and is not barred by *Mechler*.

We also agree with Villegas' point that, logistically, a piecemeal proffer of this evidence would have potentially disrupted trial while the State, the defense, and the trial court sifted through the extensive record to determine what was admissible and why. The State contends that if the trial court was concerned about managing the admission of these voluminous records, the proper course of action would have been to reserve a ruling on their admissibility and instead issue a motion in limine requiring the State to approach the bench and seek an evidentiary ruling once trial was underway. Given that the trial court can later revisit its interlocutory evidentiary call as trial progresses, we fail to see a substantive difference between those two courses of action.[9] Again, we review the trial court's actions in this case for abuse of discretion, and under this standard of review, we cannot say that the trial court's choice to expedite evidentiary rulings on dozens of hours of prison recordings by ruling pretrial, instead of receiving and addressing each recording ad hoc during trial, represents an arbitrary or unreasonable decision made without reference to any guiding rules or principles. *See Bosley v. State*, 414 S.W.2d 468, 470 (Tex.Crim.App. 1967) (statute allowing pretrial determinations "was designed to enable the trial judge to dispose of such matters sometime prior to trial to avoid delays after jurors and witnesses have been summoned"). Where a pretrial ruling is not prohibited, we will not penalize the trial court for running an efficient docket by resolving issues pretrial. Issue One is overruled.

### B.
### Villegas' Global Objection: Authenticity of Pre-March 2011 Recordings

---

[9] The one substantive difference is that by ruling on the merits of admissibility pretrial, the trial court effectively gave the State the opportunity to seek interlocutory review of the evidentiary rulings. If the trial court had reserved ruling on admissibility until trial, and had then ruled the evidence inadmissible at trial and if the jury had found defendant not guilty, the State would not have had the opportunity for appellate review of these evidentiary rulings.

13

We next deal with Villegas' global contention that we may uphold the suppression order in large part because at least some of the prison recordings were not properly authenticated. The telephone recordings in the record are split across three separate compact discs. Each disc is accompanied by affidavits, purportedly from the respective custodians of record, stating that the recordings on the disc are true and accurate. Disc One contains recordings of telephone calls Villegas made or received from July 2009 to March 2011, while he was incarcerated at the Robertson Unit prison. Villegas maintains that the trial court's suppression ruling may be upheld in its entirety as to Disc One because the attesting affidavit submitted with Disc One is insufficient to authenticate the disc as a business record. We disagree.

Records of regularly conduct activity are admissible if a custodian or other qualified witness, by testimony or a writing compliant with TEX. R. EVID. 902(10), avers that (A) "the record was made at or near the time by—or from information transmitted by—someone with knowledge;" (B) "the record was kept in the course of a regularly conducted business activity;" and (C) "making the record was a regular practice of that activity[.]" TEX. R. EVID. 803(6). Although the predicate witness does not need to be the creator of the record or have personal knowledge of its content, he must have personal knowledge of "the manner in which the records were prepared." *Granbury Marina Hotel, L.P. v. Berkel & Co. Contractors, Inc.*, 473 S.W.3d 834, 842 (Tex.App. – El Paso 2015, no pet.).

The business record affidavit to authenticate Disc One was submitted by a Manuel Fuentes and states, in relevant part:

> I was employed by the Office of Inspector General for the Institutional Division - Texas Department of Criminal Justice at the time the attached records were made. As an employee of the Office of Inspector General for TDCJ-ID, I was requested by the 34th Judicial District Attorney's Office to record and copy all phone calls stored in the Offender Telephone System placed between July 1, 2009 and March

14

3, 2011 by Daniel Villegas, an offender in the Robertson Unit of the Texas Department of Criminal Justice. Attached to this affidavit is a DVD compiled by me of phone calls made by Offender Daniel Villegas TDCJ #00731893, Robertson Unit, 07/01/2009 to 03/07/2011 on the Offender Telephone Service contained in files marked as Daniel Villegas, consisting of 136 items, Daniel Villegas 2, consisting of 136 items and Daniel Villegas 3, consisting of 97 items. The attached records are kept by the Texas Department of Criminal Justice in the regular course of business, and it was the regular course of business of the Texas Department of Criminal Justice for an employee or representative of the Texas Department of Criminal Justice, with knowledge of the act or event or filing recorded, to make the record or to transmit information to be included in the record. The records were made in the regular course of business at or near the time or reasonably soon thereafter. These records are the original or a duplicate of the original.

Villegas complains that Fuentes never avers in his affidavit that he was a records custodian for TDCJ, and that although Fuentes attested that he was part of the Office of Inspector General for TDCJ, he never made clear how that job gave him the personal knowledge of operations necessary to make his affidavit self-authenticating under TEX. R. EVID. 902(10). We disagree.

Fuentes as an attesting witness need only show that had personal knowledge of the process by which records were made. *Granbury Marina Hotel, L.P.*, 473 S.W.3d at 842. Fuentes in his affidavit sufficiently described that the disc contained all the phone calls stored in the Offender Telephone System placed between July 1, 2009 and March 3, 2011 by Villegas, whom he described as an offender in the Robertson Unit, and that the disc he compiled were of phone calls on the Offender Telephone Service contained in files marked as Daniel Villegas made by Villegas while at the Robertson Unit from July 1, 2009 to March 3, 2011. We are satisfied that the affidavit, as written, is sufficient to meet the personal attestation requirement set out in TEX. R. EVID. 902(10) and to show that Fuentes had personal knowledge of the process by which the recordings were made. Accordingly, the trial court could not have suppressed Disc One on authentication grounds.

**C.**

15

**Specific Objections**

Having determined that we can neither summarily uphold nor overturn the trial court's decision with respect to the recordings on ripeness or authentication grounds, we must now examine each statement individually to determine which, if any, were improperly excluded. The State broadly groups the statements it seeks to admit into four categories: (1) Villegas' purported admissions of guilt; (2) Villegas and Mimbela's purported efforts to tamper with specific witnesses; (3) statements purportedly showing Villegas and Rodney Williams were in the car together during the Electric Street shooting and had a silence pact; and (4) Villegas and Mimbela's purported efforts to tamper with Judge Mary Anne Bramblett, who presided over Villegas' 1995 trial and who was initially the judge in charge of Villegas' habeas corpus application before Judge Medrano was assigned to the case.

### *Standard of Review*

We review a trial judge's decision to admit or exclude evidence under an abuse of discretion standard. *Henley v. State*, 493 S.W.3d 77, 82-83 (Tex.Crim.App. 2016). A trial judge abuses his discretion when his decision falls outside the zone of reasonable disagreement. *Id*. at 83. Before we may reverse the trial court's decision, we "must find the trial court's ruling was so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Id.* (quoting *Taylor v. State,* 268 S.W.3d 571, 579 (Tex.Crim.App. 2008)).

### *Relevance and Its Limits*

Finding a piece of evidence to be relevant is the first step in a trial court's determination whether the evidence should be admitted before the jury. *Henley*, 493 S.W.3d at 83. Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

16

*Id.*; TEX. R. EVID. 401. Relevance is not an inherent characteristic of a piece of evidence, but rather describes the relationship, if any, between that evidence and the ultimate fact to be proved at trial. *Henley*, 493 S.W.3d at 84. There must be a direct or logical connection between the actual evidence and the proposition sought to be proved. *Layton v. State*, 280 S.W.3d 235, 240 (Tex.Crim.App. 2009). Only relevant evidence is admissible. *Henley*, 493 S.W.3d at 83; TEX. R. EVID. 402 ("Irrelevant evidence is not admissible.").

While our rules favor the admission of all relevant evidence, the trial court judge is still in charge of making the threshold decision whether evidence is relevant, and the court's decision will not be disturbed on appeal unless it is clearly wrong. *Henley*, 493 S.W.3d at 83. Questions of relevance are left largely to the trial court, relying on its own observations and experience. *Levario v. State*, 964 S.W.2d 290, 296 (Tex.App. – El Paso 1997, no pet.). Whether particular evidence meets the definition of relevance will not always be "cut and dried" because the determination of relevance depends upon the trial judge's perception of common experience. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App. 1990) (op. on reh'g). The "process cannot be wholly objectified" because "reasonable men may disagree whether in common experience a particular inference is available." *Id.* Thus, we cannot substitute our own reasonable perception of common experience for that of the trial court.[10] *Id.*

Even if evidence is relevant, under Rule 403, a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403. In conducting a Rule 403 analysis, the trial court should balance:

---

[10] The State argues that the applicable standard of review requires admission of the evidence unless under "no reasonable perception of common experience can it be concluded that proffered evidence has a tendency to make the existence of a fact of consequence more or less probable[.]" *Montgomery*, 810 S.W.2d at 391. We disagree. That language in *Montgomery* addresses how to determine if evidence was erroneously *admitted* as relevant. Because this case deals with the *exclusion* of evidence, this standard is inapplicable.

17

| | | • Any tendency of the evidence to **suggest decision on an improper basis** |
| --- | --- | --- |
| • The **inherent probative force** of the proffered item of evidence | *with* | • Any tendency of the evidence to **confuse or distract the jury from the main issues** |
| | | • Any tendency of the evidence to be **given undue weight by a jury that has not been equipped to evaluate** the probative force of the evidence |
| + • The **proponent's need** for that evidence | | • The likelihood that presentation of the evidence **will consume an inordinate amount of time or merely repeat evidence already admitted** |

*Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex.Crim.App. 2006).

Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Gallo v. State*, 239 S.W.3d 757, 762 (Tex.Crim.App. 2007). Still, a trial court is entitled to broad discretion in ruling on a Rule 403 objection, and great deference is given to the trial court's decision to admit or exclude evidence under Rule 403. *See Powell v. State,* 189 S.W.3d 285, 288 (Tex.Crim.App. 2006); *Mechler,* 153 S.W.3d at 439. As has been noted, "the specific result of the trial court's conscientious balance of unique facts and circumstances under Rule 403 'is not subject to scrutiny by an appellate Bureau of Weights and Standards that balances the factors gram for gram.'" *Mechler*, 153 S.W.3d at 443 (Cochran, J., concurring) (quoting *Caldarera v. Eastern Airlines, Inc.*, 705 F.2d 778, 782 (5th Cir.1983)). "The appellate court should not conduct a *de novo* review of the record with a view to making a wholly independent judgment whether the probative value of evidence . . . is substantially outweighed by the danger of unfair prejudice. It should reverse the judgment of the trial court 'rarely and only after a clear abuse of discretion.'" *Montgomery*, 810 S.W.2d at 392

### 1.
### *Purported Admissions of Guilt*

The State's second issue and its related sub-issues deal with prison phone calls in which

Villegas purportedly admits his guilt. The State contends these recordings are admissible because they are relevant to and probative of the issue of guilt. Villegas argues the recordings are not relevant, or in the alternative, that the trial court's decision to exclude the relevant calls did not fall outside the zone of reasonable disagreement because their prejudicial effect substantially outweighed their minimal probative value and could have confused the jury or left them with a false impression. We set out the relevant excerpts below.

### a.
### March 14, 2011 (Issue 2A):
### "…you have to have actual innocence, man, and we don't got that…"

On March 14, 2011, Villegas spoke with his mother Yolanda from the El Paso County Jail Annex. Toward the end of the call, Villegas and his mother discussed what Villegas' lawyer had said about the upcoming habeas corpus proceedings. In Issue 2A, the State seeks to admit the bolded portion of the excerpt below at trial:[11]

YOLANDA: I'm waiting for—I'm telling you, the stress is waiting for them to end up doing what we need them to do—

VILLEGAS: Yeah.

YOLANDA: —find out what the lawyers going to talk—the lawyer will be in Wednesday?

VILLEGAS: Yeah. I guess, yeah. I guess that's what John said. Hopefully, man, because this, this is a one-deal thing. It's either this or I—I'm screwed forever.

YOLANDA: You're screwed forever? Are you sure?

**VILLEGAS: Yup. Ain't nothing else you can do after this. That's a done deal.**

**YOLANDA: Are you sure?**

**VILLEGAS: Yup, I lost all the—only thing, you can go into the federal courts.**

---

[11] No official transcript of this conversation appears in the record. The transcription is the Court's own, based on (i) our review of the recording, (ii) an informal transcript provided by the State in its brief, and (iii) Villegas' request that we review certain contextual statements before and after the statement the State seeks to admit.

19

***You have to have actual innocence, man, and we don't got that.***

YOLANDA:  Well, again, your lawyer said it looks good though, right?

VILLEGAS:  Yeah, he said—

YOLANDA:  —everybody I talk to says that.  I mean, God, they'd have to be morons not to.

VILLEGAS:  Tch, watch, everybody—

AUTOMATED OPERATOR:  The jail administration will disconnect your call in one minute.

VILLEGAS:  —they shouldn't even, if they look at the evidence, they shouldn't have even, never even convicted me.  I mean, how retarded are them people, you know what I'm saying?

The first question is whether this statement is relevant under Rule 401.  Villegas asserts the statement is irrelevant because when he used the phrase "actual innocence," he was referring to the legal standard of actual innocence necessary to obtain relief in a habeas corpus proceeding. *See Ex parte Fournier*, 473 S.W.3d 789, 791-92 (Tex.Crim.App. 2015) (to prevail on an "actual innocence" claim in habeas, a "petitioner must show by clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence").  Villegas maintains that the meaning of the phrase "actual innocence" as a legal term of art is obvious because it occurred in a discussion of what his attorney said about habeas corpus proceedings, and that if he had actually intended it as an admission of guilt, he would not have protested almost immediately afterwards that "if they look at the evidence, they shouldn't have . . . even convicted me."  Villegas also points the Court to another phone conversation not at issue in this appeal in which he uses the phrase "actual innocence" to refer to the habeas proceedings.  Given these facts, according to Villegas, the statement has no probative value and could have been properly excluded on relevance grounds.

20

The State conceded at the evidentiary hearing that actual innocence is a legal term of art, but argued to the trial court and argues on appeal that the statement is nevertheless relevant and probative, and that the jury should be allowed to decide whether Villegas used the phrase "actual innocence" in the legal sense or as an admission of guilt. The State also contends the trial court erred in excluding this statement, because it made an improper credibility determination in ruling on evidence, since it *sua sponte* decided what Villegas meant.

Even if we assume that the statement meets the Rule 401 relevance test and that, as the State maintains, the jury should decide what Villegas intended, relevant evidence may be withheld from the jury if the probative value is substantially outweighed by prejudicial effects and the risk the jury will decide an issue on impermissible grounds. TEX. R. EVID. 403. Thus, we must look to countervailing prejudicial aspects of the evidence under Rule 403 before we can determine admissibility.

As to Rule 403, Villegas argues that the "actual innocence" dispute has the potential to confuse the jury and derail trial, and that the trial court could properly take into consideration the length of time and amount of technical detail needed to provide the jury with the context necessary to evaluate the statement. The trial court could have also determined that it would be extremely difficult to present this evidence without alerting the jury to the highly prejudicial fact that Villegas was previously found guilty and incarcerated for the same offense. Taking the prejudicial factors in concert, and weighing them against the ambiguous probative value of the statement and the State's need for the statement, Villegas maintains that the State cannot establish that the trial court abused its discretion by excluding this statement. We agree.

Confusion of the issues occurs when admission of relevant evidence nevertheless "raises the possibility that a side issue may be created which will unduly distract the jury from the main

issues in the case." *Barajas v. State*, No. 08-97-00405-CR, 2003 WL 21674201, at *5 (Tex.App. – El Paso 2003, no pet.) (not designated for publication) (citing *Smith v. State,* 959 S.W.2d 1, 13 (Tex.App. – Waco 1997, pet. ref'd)). In conducting its Rule 403 balancing test, the trial court is free to weigh the probative value of the statement against "any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence[.]" *Gigliobianco*, 210 S.W.3d at 641.

The State is correct that direct admissions of guilt are extremely probative. *Zuliani v. State*, 903 S.W.2d 812, 824 (Tex.App. – Austin 1995, pet. ref'd). But the probative value of this evidence is equivocal precisely because it is unclear whether this statement functions as an admission of guilt. Even the State concedes it is not conclusive, given the ambiguity surrounding the legal term of art "actual innocence" and its use amid a discussion of federal court, attorney advice, and habeas proceedings. The State maintains that it nevertheless has great need for this evidence, particularly in light of the suppression of Villegas' confession on coercion grounds. Still, the trial court was allowed to balance the State's need for this evidence against its murky probative value and the prejudice or confusion its use would entail.

As the State recognizes, the meaning of "actual innocence" requires context. Without context, the jury will likely give this statement undue weight. Even without making a credibility determination, the trial court could have decided that allowing this evidence would have distracted the jury and created a side issue that the jury would not have been equipped to handle absent legal context. Providing that context would necessarily expend time and resources, which the trial court could also consider in its Rule 403 analysis. Providing context would also likely involve some explanation of what habeas corpus proceedings are and what standards apply, which in turn would necessarily risk exposing the jury to the highly prejudicial fact that Villegas

22

was previously found guilty and incarcerated for the same crime. *See Barfield v. State*, 464 S.W.3d 67, 75-76 (Tex.App. – Houston [14th Dist.] 2015, pet. ref'd) (reference to previous "finding or verdict of guilt" is highly prejudicial); *Casey v. State*, 349 S.W.3d 825, 835 (Tex.App. – El Paso 2011, pet. ref'd) (reference to previous incarceration "certainly prejudicial and inadmissible under Evidence Rule 403"); TEX. R. APP. P. 21.9(d) (prohibiting reference to previous conviction for same offense on retrial). There is also great potential for prejudice, confusion, and time expenditure for the rebuttal evidence that would be necessary to allow the jury to weigh the probative value of the statement in context. Taken together, the trial court could have reasonably determined that the prejudicial attributes of the evidence are substantial.

After balancing the Rule 403 factors, recognizing that we do not measure the factors gram for gram, and viewing the trial court's ruling through the highly deferential prism of abuse of discretion, we cannot say that the scales here tipped outside the zone of reasonable disagreement. Accordingly, we conclude the trial court's decision to exclude this evidence fell within its wide discretionary authority. Issue 2A is overruled.

### b.
### *October 12, 2011 (Issue 2B):*
### *Conflicting Transcripts of Villegas' Prayer to God*

In Issue 2B, the State contends the trial court erred in excluding Villegas' October 12, 2011 phone call to his mother Yolanda because Villegas made another alleged admission of guilt during that call. Villegas maintains that the State's assertion that he made an admission of guilt is demonstrably false. At issue here are two conflicting transcripts of the October 12, 2011 conversation, in which Villegas expressed frustration to his mother over unanswered prayers to God.[12] The State offers the following self-made transcript of the conversation in its brief, with

---

[12] Save for this particular transcript, which Villegas specifically challenges as being inaccurate, Villegas assumes for argument's sake that the State's unofficial transcripts as set out in its brief are correct. We likewise rely on the

the admission of guilt italicized:

> VILLEGAS: [ . . . ] it's not even like I'm praying no more. It's just like I'm doing a remote control. Doop, rewind, press play. That's the same prayer I've been doing forever, man. That type of prayer [ . . . ] when I pray it, I don't even feel it no more. It's just like, oh, man, yeah, something else. It's a same old, same old day, you know. It's just – after you do something for so long, Mom, I don't care how much you think you can do it, you can't do it no more. It's just – it's just too much. You do it – you can do it, but –

> YOLANDA: You get past that.

> VILLEGAS: — you just – you don't do it with emotion no more. It' just like, oh, well, whatever. Please, God, let me get out of here so – *even though I'm not innocent, woo, woo, woo, woo, woo,* it's the same thing, the same prayer . . . (emphasis in original).

Villegas, by contrast, offers us a lengthier excerpt transcribed by a certified court reporter for our consideration. In this transcript of the same conversation, Villegas never refers to guilt or innocence:

> VILLEGAS: (Inaudible) they'll have it right there ready. Well, I hope they hurry up and give me justice. It's because (inaudible).

> YOLANDA: All you have to ask is, How many years to you want from me, God? It's hard for me—

> VILLEGAS: I've told him that a million times already. I'm tired of saying that; it's like a rerun.

> YOLANDA: — I know you're tired.

> VILLEGAS: I might as well.

> YOLANDA: You get to the point where you give up, that's what Satan wants.

> VILLEGAS: I've been saying the same prayer for 17 years. I'm tired. I'm tired of that same prayer. It's not even like I'm praying no more. It's like I'm doing remote control. That's the same prayer I've been doing forever, man. That same prayer, when I pray, I don't even

---

State's unofficial transcripts, noting that the Court has listened to the relevant recordings. Where Villegas has requested that we consider other portions of the recordings to provide context, we append the requested portions to the State's transcripts.

24

feel it anymore. It's like, Oh, my God, something else, same ol', same old day, you know?

After you do something for so long, Mom, I don't care how much you think you can do it. *You can't do it. It's just too much. You can do it, but you can't do it with emotion anymore. It's like, Oh, well, whatever. Please, God, let me get out of here – even though I'm not here to tell you whoo, whoo, whoo. It's the same thing, the same prayer . . .* (emphasis added).

We have reviewed the actual recording of this conversation, which appears in the record. Although we review indisputable recorded evidence *de novo*, *see Carmouche v. State*, 10 S.W.3d 323, 332 (Tex.Crim.App. 2000), listening to the recording does not provide us with indisputable evidence of what Villegas said. Accordingly, we defer to the trial court's reasonable perception. *Cf. State v. Gobert*, 275 S.W.3d 888, 891-92 (Tex.Crim.App. 2009) (where trial judge "viewed the DVD with the State's transcript in hand" and found that defendant made a particular statement contrary to the State's transcript, appellate court "will not second-guess the trial court's determination of the facts" even if the record supports conflicting conclusions of what was actually said). Further, the trial court could have decided that the probative value of the ambiguous recording was minimal, and that Villegas' unintelligible fleeting statement did not serve to alter the balance in making the fact of his guilt more or less probable. *See Mechler*, 153 S.W.3d at 440. The trial court did not abuse its discretion by excluding the statement on relevance grounds. Issue 2B is overruled.

### c.
### November 10, 2011 (Issue 2C):
### "…when I was saying that I wasn't innocent . . . I wasn't talking about the case"

We will consolidate our legal analysis of Issues 2C, 2D, and 2E, because the State's theory of admissibility for all these statements is the same. In these three sub-points, the State argues that Villegas' attempts to explain what he meant when he said he was "not innocent" are

admissible both as substantive evidence of guilt and as a way to bolster the probative value of the statements in Issues 2A and 2B.

On November 10, 2011, Villegas spoke over the phone with a woman the State identifies as "Jenny" about what happened at a court proceeding. In Issue 2C, the State seeks to admit the following conversation:

VILLEGAS: Didn't you see . . . what happened today at court? These people get your words and twist them around and do things with them that you don't even—[13]

JENNY: (unintelligible)

VILLEGAS: —you don't even mean. I mean, they get your words and totally just flip them and . . . make their own meaning out of your words and then—then it's like . . . what the hell . . .

JENNY: . . . hit someone . . . .

VILLEGAS: . . . like when I was saying that I wasn't innocent, I'm talking about my innocence as far as a sinner . . . I wasn't talking about the case . . .

JENNY: I should've busted out my tattoo . . . (unintelligible)

VILLEGAS: I mean, that's what I was talking about . . . that I'm a sinner . . . I'm not a saint, a holier-than-thou type of person . . . . And this guy sift through . . .

JENNY: (unintelligible)

VILLEGAS: . . . all of that and . . . made a whole different deal out of it . . . . Made it seem like . . . . I was like what the hell is this guy . . . . And then when he was talking about the –

JENNY: (unintelligible) . . . said fuck.

---

[13] The ellipses in the following conversations appear in the informal transcripts the State lays out in its brief. The State represents that the ellipses are an attempt "to omit unnecessary redundancies, colloquialisms, and slang. And in an attempt to limit the factual recitations in this brief to those necessary to the resolution of the State's issues, the State has also omitted phrases that are not particularly critical to this Court's analysis, while also including enough so as to avoid changing the context of the excerpt." As we previously mentioned, Villegas does not concede that the State's self-made transcripts are accurate, but in his brief he assumes for appellate purposes that they are accurate and has crafted his analysis accordingly. Villegas also includes other portions of conversations where he feels they are relevant. We note in this opinion when we cite to an excerpt that Villegas has identified in his brief.

VILLEGAS:   . . . this guy just did all kinds of work . . . . (Sighs) . . . stressed the hell out now . . . .

### d.
### November 22, 2011 (Issue 2D):
### Mimbela Preps Villegas for a Media Interview

On November 22, 2011, Villegas spoke with John Mimbela about an upcoming media interview.  Mimbela offered Villegas advice about what he should say if the reporter asked him about purportedly denying his own innocence in the jail recordings.  In Issue 2D, the State seeks to admit the following conversation excerpt:

MIMBELA:   . . . but I would touch on the fact that . . . they took your words out of context . . . Cause she might ask you about that, you know, about that conversation – all those places that they transcribed. And you might tell them, you know what? . . . they took the words out of context, but if you look into all the tapes . . . I'm constantly proclaiming my innocence

VILLEGAS:   Exactly.

    *                 *                 *

MIMBELA:   So, anyway, you can say stuff like that . . . if you look into all those tapes, you can see where I'm constantly . . . proclaiming my innocence, and yes, you know I pray as a sinner, and yes, I pray that I'm not committed in person, but I'm not a killer . . . I didn't commit this crime.

VILLEGAS:   Okay.

    *                 *                 *

MIMBELA:   . . . pretty much, like . . . you told me . . . you pray as a sinner . . . you pray as not being innocent, but I'm not a killer, God . . . please get me out of here . . . Like you said, they . . . tried to take . . . that out of context . . . but . . . that's the true explanation and that's the (unintelligible) explanation. . . . . . But if you listen to all the conversations I've had since I've been here . . . you can hear where . . . I'm proclaiming my innocence and . . . that I don't belong here . . . you know what I'm saying?

27

VILLEGAS:   Yeah.

*e.*
*November 27, 2011 (Issue 2E):*
*". . . they misconstrued my words"*

In Issue 2E, the State seeks to admit the following excerpt of a conversation between

Villegas had and his sister Michelle on November 27, 2011:

VILLEGAS:   . . . I was just talking about how . . . they misconstrued by words
            . . .

MICHELLE:   Yeah.

            *          *          *

VILLEGAS:   I'm not an innocent person as far as sin.  Not about—

MICHELLE:   Yeah.

VILLEGAS:   —not about this crime . . . .

The relevance of these statements is largely contingent on the admission of a statement

from Villegas that he is not innocent.  We have already held that the trial court did not abuse its

discretion by excluding those statements.  Without that context, the statements are confusing and

lack probative value.  Given that the predicate conversations making these conversations relevant

were properly excluded, we similarly conclude that the trial court did not abuse its discretion by

finding these conversations irrelevant and inadmissible.  Issues 2C, 2D, and 2E are overruled.

*f.*
*January 15, 2013 (Issue 2F):*
*". . . you wouldn't be in here if you didn't do something"*

In Issue 2F, the State contends it should be allowed to admit an excerpt of a conversation

in which Villegas told his girlfriend that other inmates who complained about being in prison

would not be in jail if they did not commit a crime.  Specifically, Villegas said he would tell

other inmates who complained about being in jail, "shut the fuck up, if you fucking stupid

28

motherfuckers wouldn't be doing crime, then you get busted, then you come to jail, now all you fucking talk about what's going to happen . . . you should've thought of that before you did what you had to do." The State argues that by acknowledging that other inmates are in jail because they are guilty, Villegas implicitly admits that he also knows that he is in jail because he is also guilty.

Even in context, this statement lacks probative value. Villegas does not admit guilt in this excerpt, and his observation that other inmates in prison are guilty does not serve to make the fact of Villegas' guilt more probable absent a chain of attenuated inferences. The link between evidence and the purpose for which it is offered must be direct or logical. The trial court could have reasonably determined that any link between Villegas' statement about other prisoners and the consciousness-of-guilt grounds the State advances is neither direct nor logical. The trial court did not abuse its discretion in excluding the statement, because it does not support any reasonable inference of any consciousness of guilt. Issue 2F is overruled.

*2.*
### *Efforts to Tamper with Witnesses*

We next turn to Villegas' purported efforts to influence witnesses in the lead-up to his habeas corpus hearing. Broadly, the State contends in Issues 3 through 6 that Villegas and Mimbela conspired to offer witnesses various incentives in an attempt to downplay previous inculpatory statements he may have made and to "fabricate" evidence that Javier Flores or Rudy Flores were the actual Electric Street shooters. The State seeks to admit in its case-in-chief recordings of Villegas and Mimbela discussing outreach efforts to potential witnesses and incentives offered to witnesses as substantive evidence of Villegas' consciousness of guilt.[14]

---

[14] We note that while the trial court denied the State's request to use these calls as substantive evidence in its case-in-chief, the trial court did not foreclose the possibility that at least some of these calls may be relevant as impeachment evidence on cross-examination:

**a.**
**Statements as Hearsay**

Villegas encourages us to affirm the suppression order as to all of the conversations involving Mimbela's efforts to contact witnesses based on the theory that everything Mimbela and others told Villegas is either hearsay or double hearsay. The State contends the statements are not hearsay and are admissible against Villegas as adoptive admissions, statements by an agent, or statements by a co-conspirator in a felony witness tampering scheme.[15] We conclude the trial court did not abuse its discretion in suppressing the relevant statements, because the State failed to establish the predicates necessary to admit those statements under an exclusion or exception to the general hearsay rule.

Hearsay is a statement, other than one made by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted. TEX. R. EVID. 801(d); *see also Willover v. State,* 70 S.W.3d 841, 845 (Tex.Crim.App. 2002). Hearsay is not admissible except as provided by statute or the rules of evidence. TEX. R. EVID. 802; *Willover*, 70 S.W.3d at 845 ("hearsay evidence is inadmissible unless if falls within one of the many exceptions" to the

---

THE COURT: . . . Please – the State, please don't infer that by these conversations not coming in that you can't ask any witness that takes the stand whether they have been offered reward money or any of those types of questions[.]

Because the State has limited its arguments on appeal to the use of the phone calls as direct evidence of Villegas' consciousness of guilt, we focus solely on the calls as substantive evidence of guilt.

[15] The State also argues the statements are not hearsay because they are not being offered to prove the truth of the matters asserted. Villegas correctly notes that the State failed to raise this argument in the trial court. As we have recognized, to preserve error, a "party must not only tell the judge that the evidence is admissible, but must also explain why the evidence is admissible." *Perez v. State*, No. 08-14-00050-CR, 2016 WL 4447566, at *5 (Tex.App. – El Paso Aug. 24, 2016, no pet.) (not designated for publication). A party offering a statement that is challenged as hearsay must "specify which exception to the hearsay rule he was relying upon or to specify how the evidence was not hearsay" or else those grounds are waived. *Id.*; *See Reyna v. State,* 168 S.W.3d 173, 178 (Tex.Crim.App. 2005) ("In order to have evidence admitted under a hearsay exception, the proponent of the evidence must specify which exception he is relying upon."). Further, even in cases in which the State is the appealing party, "the basic principle of appellate jurisprudence that points not argued at trial are deemed to be waived applies equally to the State and the defense." *State v. Mercado*, 972 S.W.2d 75, 78 (Tex.Crim.App. 1998). Because the State never raised this argument in the trial court, it is waived on appeal. We therefore assume the statements were being offered for the truth of the matters asserted.

30

general rule).  Whether an out-of-court statement is admissible under an exclusion or exception to the general hearsay rule is a matter within the trial court's discretion.  *Zuliani* v. *State,* 97 S.W.3d 589, 595 (Tex.Crim.App. 2003).  The trial court's decision will be reversed only if it is "outside the zone of reasonable disagreement."  *Salazar v. State,* 38 S.W.3d 141, 151 (Tex.Crim.App. 2001); *see also Pena v. State,* 353 S.W.3d 797, 814 (Tex.Crim.App. 2011). The Rules of Evidence exclude numerous out-of-court statements from the hearsay rule by deeming them as non-hearsay.  TEX. R. EVID. 801(e).  We discuss three types of these non-hearsay statements below.

### i.
### Adoptive Admissions

The State first maintains that the statements of speakers other than Villegas are admissible as non-hearsay because Villegas adopted the truth of those statements by not explicitly refuting the statements when made.  Villegas contends that the trial court could have properly found that his silences and ambivalent responses were insufficient to impute statements made by others to him as adoptive admissions.  We agree with Villegas.

An out-of-court statement is not hearsay if it is an adoptive admission, *i.e.,* if a party has manifested an adoption or belief in its truth.  TEX. R. EVID. 801(e)(2)(B).  Statements made by others in a defendant's presence may be admissible as adoptive admissions if the defendant, "by his actions and responses, showed agreement with the statements."  *Paredes v. State*, 129 S.W.3d 530, 534 (Tex.Crim.App. 2004).  Occasionally, acquiescence may be inferred from silence. *Gibson v. State*, 516 S.W.2d 406, 409 (Tex.Crim.App. 1974) ("[A]n accused's acquiescence by silence in a statement that he heard and understood, that was made by a third person while the accused was not under arrest and that would call for a denial of guilt, may be used as evidence at trial through a tacit admission exception to the hearsay rule.").  In this case, the "State, as the

31

proponent of the evidence, had the burden of proving to the trial court, by a preponderance of the evidence, that . . . [the] testimony qualified as an adoptive admission[.]" *Alvarado v. State*, 912 S.W.2d 199, 215 (Tex.Crim.App. 1995).  The trial court, by excluding the evidence, found the State did not meet its burden.  We review that ruling for abuse of discretion.  *Id*.

While the subject matter of the conversations at issue varies, neither party disputes that in every recorded conversation, Mimbela does the majority of the speaking, relaying details of his efforts to track down and speak with witnesses, with Villegas responding generally with "yes" or "yeah."  Villegas contends that the state of the record is too vague to support the inference that he adopted the statements of other speakers.  In support of his argument, Villegas directs us to an unpublished case from the United States Court of Appeals for the Ninth Circuit interpreting the adoptive admissions exemption from hearsay under the Federal Rules of Evidence.  *See United State v. Sanchez-Soto*, 617 Fed.App'x 695, 696-97 (9th Cir. 2015).  In that case, counsel read an excerpt of an English-language transcript of a Spanish conversation the defendant Sanchez had with his wife after he was arrested on a drug trafficking charge:

| Sanchez: | Did Chui give you anything? |
|---|---|
| Marta: | No.  Just, uh, 1500 for the thing about the dogs, because he told Mario to bring us some money. |
| Sanchez: | Oh, okay.  Well, so . . . |

The Ninth Circuit observed that "[a] statement is only admissible as an adoptive admission if there are 'sufficient foundational facts' that would allow the 'jury reasonably to conclude that the defendant did actually hear, understand and accede to the statement.'"  *Id*. at 697.  It then held that, under the circumstances, the admission of the statement was erroneous, in part because "[t]he four words he used reveal little of his intent to adopt" and "could have just as readily indicated his mere acknowledgement that he heard the statement, not that he was acceding to its

truth." *Id*.

While *Sanchez-Soto* is not precisely on point, the Texas Rules of Evidence are largely structured like the Federal Rules of Evidence, and we believe that the Ninth Circuit's observations about the ambiguity of the statements weighs in our hearsay analysis, particularly given that here, the trial court excluded the evidence and the trial court's rulings are generally entitled to deference on appeal. Given the equivocal state of the record, we cannot say that the trial court abused its discretion in finding that Villegas did not adopt other speakers' statements.

## ii.
## Agent

The State next argues that the statements are admissible as non-hearsay because Mimbela was acting as Villegas' agent. *See* TEX. R. EVID. 801(e)(2)(D). The State does not make clear in what capacity Mimbela served as Villegas' agent, nor does it define the scope of the purported agency relationship. The trial court made an explicit oral finding that Mimbela was not Villegas' agent. We review this exclusionary decision for abuse of discretion.

As an initial matter, the State and Villegas clash over what standard to measure agency for purposes of Rule 801(e)(2)(D). The State proposes we follow the agency test the Court of Criminal Appeals laid down in determining when a person not in law enforcement effectively begins acting as an agent for law enforcement. *See Wilkerson v. State*, 173 S.W.3d 521, 530-31 (Tex.Crim.App. 2005) (framing the inquiry as whether the non-LEO party is "acting as an 'instrumentality' or 'conduit' for the police or prosecution"). Villegas insists the correct test for determining agency under Rule 801(e)(2)(D) focuses on whether the purported principal exercised actual control over the agent. *See Farlow v. Harris Methodist Fort Worth Hosp.*, 284 S.W.3d 903, 927-28 (Tex.App. – Fort Worth 2009, pet. denied) (concluding statement is not admissible under agency exception to hearsay rule absent testimony "as to any indicia of control

33

or agency relationship"); *Vahlsing Christina Corp. v. Ryman Well Serv., Inc.*, 512 S.W.2d 803, 812 (Tex.Civ.App. – Corpus Christi 1974, writ ref'd n.r.e.) ("The basic test is the right to control.").

We will follow the approach outlined by Villegas. *Wilkerson* does not reference the Texas Rules of Evidence, but instead centers on whether CPS investigators essentially became agents of the police in a particular case for purposes of *Miranda*. By contrast, *Farlow* and *Vahlsing*, although civil cases, directly interpret Rule 801(e)(2)(D). We conclude that the test for determining whether a person is an agent for purposes of Rule 801(e)(2)(D) is whether the party had a right to control the agent-declarant.

"The burden of proving agency rests upon the party affirming such agency, and it cannot be established by a mere assertion that such is known to be true without divulging the duties of the agent and character of his representation." *Norton v. Martin*, 703 S.W.2d 267, 272 (Tex.App. – San Antonio 1985, writ ref'd n.r.e.). The State concedes that establishing the factual predicate of a statement made in an agency relationship "would require testimony outside the recordings, from either Mimbela or another individual with personal knowledge, establishing that Mimbela was in fact acting as Villegas's agent." No such testimony was offered at the admissibility hearing.

Despite this concession, the State maintains that the conversations alone are sufficient to establish that Mimbela and Villegas are "in cahoots," and asks us to infer an agency relationship, despite the trial court's explicit finding, because (1) Mimbela was clearly performing certain actions on Villegas' behalf, and the only person to benefit from Mimbela's actions was Villegas, and (2) Villegas did not repudiate Mimbela's efforts and instead provided him with information

to track down witnesses, thereby leading to a ratification[16] of any actions done without Villegas'

prior knowledge. Even if the recordings standing alone could show that Mimbela was acting at

Villegas' behest either directly or through ratification as an agent, the State must also show the

statements pertained to a matter within the scope of that relationship and that the statement was

made while the relationship existed, to be admissible as non-hearsay under Rule 801(e)(2)(D).

S*ee Norton*, 703 S.W.2d at 272. "[W]ithout divulging the duties of the agent and character of his

representation[,]" the State cannot show that it is entitled to use Mimbela's statements at trial.

*Id.* at 272. The State fails to point to any evidence suggesting the nature or scope of Villegas'

and Mimbela's purported agency relationship, or how wide a scope Mimbela had in acting on

Villegas' behalf. Given the paucity of evidence on this point, the trial court did not abuse its

discretion in rejecting the State's agency-as-non-hearsay argument based on the record

presented.

### iii.
### Co-Conspirator

The State also argues that the statements are admissible as non-hearsay as the statements

of a co-conspirator. We disagree. Rule 801(e)(2)(E) allows for the admission of out-of-court

statements "made by the party's coconspirator during and in furtherance of the conspiracy."

TEX. R. EVID. 801(e)(2)(E). To gain admission of statements made by a co-conspirator, the State

must prove the existence of a conspiracy. *Wilkerson v. State*, 933 S.W.2d 276, 279 (Tex.App. –

Houston [1st Dist.] 1996, pet. ref'd). The existence of the conspiracy "may be established by

direct or circumstantial facts and may be inferred from the evidence[,]" *Id.* The State, however,

must "establish a prima facie case of conspiracy" using evidence "separate and apart from the

---

[16] Ratification "occurs when a principal supports, accepts, or follows through on the efforts of a purported agent." *Lozada v. Farrall & Blackwell Agency, Inc.*, 323 S.W.3d 278, 292 (Tex.App. – El Paso 2010, no pet.).

otherwise hearsay statement." *P. McGregor Enterps., Inc. v. Hicks Const. Group, L.L.C.,* 420 S.W.3d 45, 54 (Tex.App. – Amarillo 2012, no pet.) (interpreting TEX. R. EVID. 801(e)(2)(E) in civil case); *see also Deeb v. State*, 815 S.W.2d 692, 696 (Tex.Crim.App. 1991) (hearsay statements of co-conspirator are admissible "[w]here there is sufficient independence evidence to establish a conspiracy"). Here, the State made no evidentiary showing beyond the calls themselves to prove that a witness tampering conspiracy existed between Villegas and Mimbela. Absent independent evidence showing a prima facie case for conspiracy, the statements could not be admitted under a co-conspirator non-hearsay theory.

### iv.
### Double Hearsay

Villegas identifies the statements the State contends are admissible in Issues 3C, 3E, 3F, 4B, 4D, 4E, 5C, 5D, 5G, 7B, 8A, 8B, and 9C as all containing double hearsay. The record confirms that these issues all involve statements in which one out-of-court speaker is conveying the statements of at least one other out-of-court speaker. When double hearsay is involved, to be properly admissible, each level of hearsay must fall under an exception. *See Sanchez v. State*, 354 S.W.3d 476, 485-86 (Tex.Crim.App. 2011) ("When hearsay contains hearsay, the Rules of Evidence require that each part of the combined statements be within an exception to the hearsay rule."); *Crane v. State,* 786 S.W.2d 338, 354 (Tex.Crim.App. 1990); *see also* TEX. R. EVID. 805 ("[h]earsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule"). And, for the State to overcome a double hearsay objection, "each separate identifiable increment of hearsay must be distinctly justified under some recognized exception to the hearsay rule." *Davis v. State,* 696 S.W.2d 494, 498 (Tex.App. – El Paso 1985, no pet.). The State has not addressed double hearsay in its brief, nor has it provided any explanation that would allow these statements to pass through two or

36

more layers of hearsay. The failure to adequately brief an issue, either by failing to specifically argue and analyze one's position or to provide authorities and record citations, waives any error on appeal. *See Swearingen v. State,* 101 S.W.3d 89, 100 (Tex.Crim.App. 2003). As such, we affirm the trial court's rulings as to the double hearsay statements.

### *v.*
### *Conclusion*

Because we must affirm the trial court's evidentiary ruling if there is any legally valid theory to support the ruling, and because the State has waived any argument that the statements were being offered for a purpose other than the truth of the matter asserted, and because the State failed to proffer any evidence necessary to establish the statements as non-hearsay or otherwise establish that a hearsay exception exists to admit these statements, the trial court did not abuse its discretion in barring the admission of statements from speakers other than Villegas himself.

### b.
### Specific Allegations of Witness Tampering

We pause before proceeding to note the effect of our previous rulings. As the following excerpts reveal, Mimbela was the primary speaker in the remaining recordings. But, as we have concluded, the trial court did not abuse its discretion in excluding all the statements made by Mimbela and others in these recordings on hearsay grounds. The relevance of the remaining excerpts on the whole is largely contingent on Mimbela's excluded testimony because without the context of Mimbela's statements, the excerpts are confusing and lack probative value. Given that Mimbela's side of these conversations, which the trial court properly excluded, is necessary to make these conversations relevant, we similarly conclude that the trial court did not abuse its discretion by finding the remainder of these conversations irrelevant and inadmissible.

However, given the possibility that the trial court could re-examine its rulings at trial and

37

that the State could provide the missing predicates at trial to overcome the hearsay hurdles, we proceed to address, in the interest of judicial efficiency, whether, considering the following excerpts as a whole including Mimbela's statements, the trial court abused its discretion in excluding the following recordings on relevance or Rule 403 substantial-prejudice grounds.

In Issues Three through Seven and the related sub-issues therein, the State seeks to admit recordings recounting Villegas' and Mimbela's efforts to contact prospective witnesses Wayne Williams, Jesse Hernandez, Juan Medina, Rudy Flores, Arasally Flores, and Jose Juarez in the lead-up to the habeas corpus proceedings. The State theorizes that the conversations between Mimbela and Villegas regarding outreach to these witnesses are admissible because they evince Villegas' consciousness of guilt by showing the existence of a concerted plan to tamper with witnesses. Essentially, the State argues that all the actions described in the conversations are admissible as evidence of guilt because they show that Villegas did not behave like an innocent man. Villegas contends his actions, and those of Mimbela, are consistent with his claims of innocence, and that in any event, the recorded calls mostly involve the actions of Mimbela over whom Villegas had no control. As such, any inference of consciousness of guilt is unreasonable.

Any conduct on the part of a person accused of a crime subsequent to its commission that indicates a consciousness of guilt may be received as a circumstance tending to prove that he committed the act with which he is charged. *Torres v. State*, 794 S.W.2d 596, 598 (Tex.App. – Austin 1990, no pet.). An attempt to tamper with a witness is evidence of consciousness of guilt. *Wilson v. State*, 7 S.W.3d 136, 141 (Tex.Crim.App. 1999). A person completes the offense of tampering with a witness once the person offers, confers, or agrees to confer a benefit to the witness "in a manner calculated to cause false testimony." *Navarro v. State*, 810 S.W.2d 432, 437 (Tex.App. – San Antonio 1991, pet. ref'd); *see also* TEX.PENAL CODE ANN. § 36.05(a)(1)

38

(West Supp. 2016). The efforts of third parties who attempt to tamper with witnesses at the defendant's behest may be admissible as evidence of consciousness of guilt. *See Gonzalez v. State*, 117 S.W.3d 831, 842 (Tex.Crim.App. 2003) (defendant's attempt to use attorney to bribe a witness to give favorable testimony "would support an inference that such conduct demonstrated defendant's consciousness of guilt"); *cf. Agbogwe v. State*, 414 S.W.3d 820, 826 (Tex.App. – Houston [1st Dist.] 2013, no pet.) (counsel's failure to object to evidence that defendant's friends asked assault victim to drop charges and refuse to comply with subpoena and offered to pay fines for subpoena noncompliance was not ineffective assistance of counsel because that evidence was admissible as proof of defendant's consciousness of guilt). We address the admissibility of the relevant conversations witness by witness.

**i.**
**Wayne Robert Williams**

Prospective witness Wayne Robert Williams was detained in jail with Villegas in 1993 following the Electric Street shooting. The State alleges that while in jail, Villegas told Williams he shot Lazo and England. Villegas, on the other hand, maintains that he never made that statement. In Issues 3A through 3F, the State seeks to admit six statements detailing Villegas and Mimbela's efforts to track Williams down and determine what he remembered Villegas saying that night in 1993. Mimbela and Villegas also wanted to learn if Williams knew anything about the potential involvement of Rudy Flores in the Electric Street shooting. The State maintains these statements show Mimbela and Villegas conspired to attempt to get Williams to change his potential testimony implicating Villegas in the Electric Street shooting.

*1.*
*July 6, 2009 Recording (Issue 3A)*

On July 6, 2009, Mimbela and Villegas began their discussions about tracking down

39

Williams:

MIMBELA: . . . this Williams guy . . .[17]

VILLEGAS: . . . the one that uh

MIMBELA: We – the one that was in the can with you . . . .

VILLEGAS: Yeah.

    *           *           *

MIMBELA: And he's about . . your guys' age. . . . He was born in '76, so that's only what a year older than you?

VILLEGAS: Yeah.

MIMBELA: And he lived – the addresses that we had for him was Salem and Blossom, which are right there, right around Northeast . . . that area where [Flores] lives.

VILLEGAS: Exactly, huh? Think it's Salem, wasn't it Salem?

    *           *           *

MIMBELA: . . . this guy is the Robert Williams guy – this is the guy that you said that told you that it was [Flores], right?

VILLEGAS: Yeah, that's the one right there.

    *           *           *

VILLEGAS: That's the one – pretty sure, that's the guy right there.

    *           *           *

VILLEGAS: . . . and I hope . . . this Robert Hall guy . . . remembers . . . and . . . helps us out . . . .

MIMBELA: Who's that?

VILLEGAS: That . . . Williams . . . .

**2.**
*July 13, 2009 Recording (Issue 3B)*

---

[17] All alterations are those made by the State in its informal transcript in its brief.

On July 13, 2009, the discussion over Williams continued:

MIMBELA:   . . . This is what we're gonna do now.  We're gonna look for him, now, okay?

VILLEGAS:  Okay . . . he's going to know me as Danny – Danny Boy.

*          *          *

MIMBELA:   Now, we're gonna start looking for him and see if he can lead us to Rudy Flores or whoever he . . . might be able to lead us to . . . .

### 3.
### July 22, 2009 (Issue 3C)

On July 22, 2009, Mimbela told Villegas during a phone conversation that he had successfully located Williams.  He then relayed the conversation he had with Williams to Villegas:

MIMBELA:   . . . we did get a hold of that Robert Williams guy.

VILLEGAS:  Yeah, I was reading about him . . . he was lying like a mug . . . .

MIMBELA:   . . . We're just trying to get some leads . . . He didn't really seem to have any personal knowledge about [Flores] . . . .

*          *          *

MIMBELA:   . . . he said that he doesn't have any personal knowledge of . . . that [Flores] had done it, and he says that the last conversation he remembers with you was that . . . you were kind of bragging about that you had done it.

VILLEGAS:  . . . that's what I'm saying . . . I was like, man, come on . . . I don't even got a tattoo on my back that says "Diana."

MIMBELA:   No?  He . . . couldn't remember the name . . . do you have a girl's tattoo . . . on your back of anything?

VILLEGAS:  I've got a girl's tattoo on my back, but it don't say no name.  It says "El Paso" on it.

MIMBELA:   Really?  But did you have it way back then?

41

VILLEGAS:   Yeah.

*              *              *

MIMBELA:   . . . we didn't want to get him upset because . . . you could tell . . . he got upset real easy.

VILLEGAS:   Yeah.

MIMBELA:   . . . cause I told him . . . you know what Daniel says that you pointed out [Flores] to him. "I never pointed out no [Flores] . . . ."

### 4.
### *July 27, 2009 Recording (Issue 3D)*

Five days after relaying Williams' comments to Villegas, on July 27, 2009, Mimbela told Villegas about his plan to offer Williams a job at Mimbela Construction:

MIMBELA:   . . . I got a hold of that Robert Williams again, and . . . I'm going to interview him for a job tomorrow.

VILLEGAS:   Ah-hah.

MIMBELA:   . . . I'm going to hire him so I can have him close to me and I get all kinds of information from him.

VILLEGAS:   Okay. (Laughs)

MIMBELA:   Okay? (Laughs) I already have Juan Medina on payroll.

VILLEGAS:   (Laughs) Alright.

MIMBELA:   Okay, so . . . he's gonna go tomorrow for an interview at 9:00 . . . he gave us some good information. . . . I just want to be able to have him close to us. . . .

VILLEGAS:   Alright. . . .

### 5.
### *May 10, 2011 Recording (Issue 3E)*

Nearly two years after offering Williams a job interview with Mimbela Construction, in the months leading up to the habeas corpus decision, Mimbela told Villegas that he had again

42

asked Williams about what happened when he was in jail with Villegas. Mimbela related that Williams still denied knowing anything about Flores' involvement in the Electric Street shooting and insisted that Villegas had admitted to the shooting. Mimbela and Villegas then discussed whether Williams would be called at the habeas hearing:

MIMBELA: What Roberts remembers . . . before he met you . . . he said they're always accusing him of . . . this crime . . . and I remember when Danny came in . . . and this is what he remembers . . . and . . . I told him your version . . . Daniel says that you told him . . . when you asked him why he was in there, he said, nah . . . he goes . . . [Flores] is the one who did it . . . isn't that what you told me?

VILLEGAS: Yeah . . . exactly.

MIMBELA: . . . he goes, nah, I never said that. He goes, what I remember . . . asking him what he was in there for, and he tells me, well, I'm the one who . . . blew away those guys with a shotgun.

&ast;   &ast;   &ast;

MIMBELA: . . . I'm not sure how we're going to be able to use this guy. I know he's helpful as far as . . . saying that . . . Marquez was harassing him too . . . He says that . . . you told him that . . . a shotgun , which, you know, I mean . . . I didn't tell him anything about that shotgun part . . .

VILLEGAS: Uh-huh.

MIMBELA: . . . about what David said, so . . . he's pretty accurate there.

VILLEGAS: . . . what did he say, that I told him what?

MIMBELA: That you told him that . . . you had . . . blown those guys away with a shotgun.

VILLEGAS: (Laughs) Nah, I never told him that.

MIMBELA: No?

VILLEGAS: Huh-uh.

MIMBELA: . . . I don't know . . . this is what he told me . . . John . . . when he came up to me that day, I always thought that . . . Daniel had done

43

it because that's what he told me. . . .

VILLEGAS: I think he's lying . . .

MIMBELA: . . . but, now that you've shown me all this stuff . . . and you tell me exactly how it happened . . . yeah, he goes . . . I don't believe it. But he goes, that was my . . . understanding back then because I never really knew what happened . . .

＊　　　　　　＊　　　　　　＊

VILLEGAS: . . . the only thing I can think of, if I told him anything, I had to tell him that . . . I told my cousin that . . . that I told David that . . .

MIMBELA: . . . you see . . . maybe that's what he . . . what you told him, but that's what I'm saying . . . that's the thing about it is that . . . it's been so long that . . it's hard to . . . get everything . . . perfectly straight. . . .

**6.**
**June 20, 2011 Recording (Issue 3F)**

In another jail recording on June 20, 2011, Mimbela told Villegas that Williams stood by his story that Villegas had admitted being the shooter, and they were not going to use him as a witness:

MIMBELA: ...we tried talking to...Robert Williams today again. But, nah, he keeps saying that you were still bragging about it.

VILLEGAS: ...he's lying...

MIMBELA: ...we're not gonna use him.

Mimbela's job offer to Williams is a textbook example of impeachment evidence, as it would tend to establish a bias that could be explored during cross-examination. *Carpenter v. State*, 979 S.W.2d 633, 634 (Tex.Crim.App. 1998) (noting that parties have "great latitude" under the rules to cross-examine witnesses on facts tending to "establish ill feeling, bias, motive and animus"). However, the State does not seek to admit these statements in order to impeach Williams, nor did the trial court foreclose this possibility. Rather, the State alleges that these

44

conversations are admissible as substantive evidence of Villegas' consciousness of guilt. The State believes these statements demonstrate an attempt by Villegas to have Mimbela offer Williams a job in an effort to corrupt Williams' potential testimony. In the State's eyes, the fact that Williams' testimony remained the same over a period of two years is irrelevant; the attempt is enough to render these conversations admissible during the State's case-in-chief. As such, the State urges us to reverse the trial court's order excluding this evidence from being offered to establish consciousness of guilt.

Complicating our efforts is the fact that the Texas Court of Criminal Appeals only recently allowed the State to seek review of evidence suppressed pretrial based on the Rules of Evidence, as opposed to orders suppressing evidence based on constitutional or statutory violations. *See Medrano*, 67 S.W.3d at 903. Consequently, most appellate decisions discussing evidentiary abuse-of-discretion calls in the criminal context involve aggrieved defendants complaining that the State's evidence was improperly admitted at trial, with the appellate courts properly and deferentially blessing the admission of evidence on relevance grounds, even if the evidence only "provides a small nudge toward proving or disproving some fact of consequence." *Levario*, 964 S.W.2d at 297. Indeed, the State cites numerous examples of these cases as proof that this particular evidence can meet the relevancy threshold on a witness-tampering theory.[18] But few, if any, cases involve complaints by the State that the trial court improperly *excluded* evidence on evidentiary grounds. Those cases that do often deal with evidentiary issues that are more straightforward than relevance or Rule 403 prejudice, such as the application of a hearsay

---

[18] *See Wilson v. State*, 7 S.W.3d 136, 141 (Tex.Crim.App. 1999); *Garza v. State*, 358 S.W.2d 622, 623 (Tex.Crim.App. 1962); *Pizano v. State*, No. 01-12-00994-CR, 2013 WL 3155954 at *1 (Tex.App. – Houston [1st Dist.], June 20, 2013, no pet.) (mem. op., not designated for publication); *Edwards v. State*, No. 14-05-00634-CR, 2006 WL 3270829, at *6 (Tex.App. – Houston [14th Dist.], Nov. 14, 2006, pet. ref'd) (mem. op., not designated for publication); *see also Gonzalez v. State*, 117 S.W.3d 831, 842 (Tex.Crim.App. 2003); *Agbogwe v. State*, 414 S.W.3d 820, 835 (Tex.App. – Houston [1st Dist.] 2013, no pet.).

exception, *see, e.g, Cox*, 843 S.W.2d at 752, or the admission of scientific evidence. *See*, *e.g.*, *Esparza*, 413 S.W.3d at 86.

In any event, the standard of review for the admission or exclusion of evidence is ultimately the same: abuse of discretion. To avoid the distorting effects that come with using admission-heavy case law to determine an exclusion case, we must firmly anchor ourselves to the well-worn abuse of discretion standard and use *Montgomery* as our lodestar in determining relevancy. *Montgomery* recognizes that a trial judge's relevance determination will largely hinge upon that "judge's perception of common experience" while also cautioning appellate courts to stay their hand if "[r]easonable men may disagree whether in common experience a particular inference is available" so as to avoid substituting one reasonable inference for another and thereby "commandeering a function institutionally assigned elsewhere." *Montgomery*, 810 S.W.2d at 391. Synthesized to a core statement, *Montgomery* stands for the proposition that we will not intervene if the trial court's relevancy call falls within the zone of reasonable disagreement. *Id*.

Further, we believe that the State's discussion of Mimbela and Villegas' relationship in its argument of an agency exception to hearsay also frames the trial court's relevancy inquiry. Mimbela's statements and actions are only relevant to show Villegas' consciousness of guilt if it can be reasonably inferred that Villegas directed or controlled Mimbela's actions beforehand or ratified Mimbela's actions afterward. But, because we review this question under the deferential abuse of discretion standard—mindful of our duty not to usurp the trial court's reasonable inferences and replace them with our own—our inquiry becomes even more refined. Accordingly, the ultimate question as guided by *Montgomery* is this: viewing the statements from the position of common experience, is there room for reasonable disagreement as to

46

whether it can be inferred Mimbela was acting with corrupt intent at Villegas' behest? "As long as the trial court's ruling was at least within the zone of reasonable disagreement, we will not intercede." *Levario*, 964 S.W.2d at 297.

We must decide whether the inference underpinning the judge's evidentiary decision is so unreasonable that it falls outside the zone of reasonable disagreement. When measuring the ruling in light of this standard, the ambiguity of the evidence makes our decision clear. We agree with Villegas that the trial court, in viewing the evidence that Mimbela offered Williams a job, could, in a reasonable perception of common experience, reasonably reject the inference of an insidious explanation for the phone calls, given the lack of an explicit quid pro quo proposal aimed at changing Williams' testimony, the ambiguity surrounding how much control Villegas asserted over Mimbela, and the fact that interviewing witnesses while conducting a post-conviction habeas investigation is not, in and of itself, suspect. Indeed, the trial court explicitly rejected the idea that Mimbela was acting as Villegas' agent based on the record presented. Because the evidence as presented is inconclusive and subject to the trial court's reasonable perception of common experience, we will not disturb the trial court's ruling. Issues 3A through 3F are overruled.

### ii.
### Jesse Hernandez and Juan Medina (Eyewitnesses)

Jesse Hernandez and Juan Medina were eyewitnesses to, and the only survivors of, the Electric Street shooting. Hernandez and Medina testified at both of Villegas' trials, with their testimony remaining largely consistent between trials. Neither identified Villegas as the shooter. Hernandez later submitted an affidavit as part of Villegas' habeas corpus application. In the affidavit, Hernandez attested that the investigating detective had initially accused him of murdering England, that the detective yelled at Hernandez until he began crying uncontrollably,

47

and that if the detective had not stopped yelling, Hernandez believed that he "would have confessed to something [he] didn't do." In Issues 4A through 4E, the State maintains that the trial court should have admitted several conversations in which Mimbela describes his outreach efforts to these witnesses. Mimbela also admits that he hired Medina at Mimbela Construction and took him to see a boxing match. The conversations appear below.

*1.*
*July 27, 2009 Recording (Issue 4A)*

This statement, which also forms the basis of State's Issue 3D, consists of John Mimbela acknowledging to Villegas that he has Juan Medina on Mimbela Construction's payroll.

*2.*
*January 11, 2010 Recording (Issue 4B)*

On January 11, 2010, Mimbela informed Villegas that he had taken Jesse Hernandez to see the Sun Bowl football game:

MIMBELA:    . . . and then Jesse . . . told you about . . . we took Jesse . . . to the football game?

VILLEGAS:  Did he go?

MIMBELA:    Yeah, he went.  Yeah, I took a picture of him too. . . .

          *          *          *

MIMBELA: . . . I'm going to send you the picture of Jesse . . . at the football game. . . . He sat there with us and we talked a lot and . . . he never been to a football game.

VILLEGAS:  Oh, no?

MIMBELA:    No, and . . . to the Sun Bowl . . . a big game like that . . . he was all excited. . . . Same thing with him, "John, I'm ready.  Whenever you need me to go testify, I'm ready."

*3.*
*July 26, 2010 Recording (Issue 4C)*

On July 26, 2010, Mimbela asked Villegas to write a letter to Juan Medina, thanking him for his help with Villegas' post-conviction efforts. Mimbela also explained to Villegas that Medina had financial issues related to medical expenses:

MIMBELA:    . . . I need you to do one more letter, and this one you got to make it good, okay?

VILLEGAS:   Alright.

MIMBELA:    . . . Juan Medina's really been helping us a lot okay? . . . I had lunch with him today again.

                        *               *               *

MIMBELA:    . . . but like I said . . . he is going out of his way . . . of course, I've been helping him a lot in his financial situation too, but . . . like I told him, we're here to help each other . . . and I know that . . . he's got this little boy too – I don't know if I told you that he's . . . got a bad illness . . . . I'll explain it to you, we're gonna go see you this weekend, okay?

VILLEGAS:   Okay.

### 4.
### August 7, 2010 Recording (Issue 4D)

On August 7, 2010, Mimbela related the following conversation he had with Jesse Hernandez to Villegas, which the State alleges occurred when Mimbela took Hernandez to sit ringside at a high-profile boxing match involving boxer Antonio Escalante in Los Angeles:

MIMBELA:    . . . did you get that letter out to Jesse?

VILLEGAS:   Yeah, I sent one out to Jesse, Medina, and to the reporter.

MIMBELA:    Okay, great, great. Yeah, Jesse was there, he sat with us there at ringside too . . . and . . . he was telling me that . . . "John, I'm really glad . . . that you're doing this . . . I really want to thank you too," and I go, "why? I want to thank you for supporting this. . . ." He goes . . . "I just . . . see everything that you're bringing out and I'm just glad that . . . you brought this up to us because I didn't want to continue to live this lie . . . " . . . he was like, anything else you need . . . just . . . whenever you have something, just call me . .

49

. and he's like, you know what, you don't have to be like buying me stuff. . . .

### 5.
### *September 20, 2010 Recording (Issue 4E)*

On September 20, 2010, Mimbela told Villegas that he had made contact with potential witness Rocio Gutierrez, and that he had also taken her to the boxing match. He then related details about the match:

MIMBELA:   . . . we also met that girl I told you – Rocio over there in L.A.?

VILLEGAS:   Yeah.

MIMBELA:   Yeah, she's also very much on board too. . . . We showed her a great time . . . we went to that . . . boxing match, remember?

VILLEGAS:   Yeah . . .

*               *               *

MIMBELA:   . . . we had a great time . . . we . . . sat on the floor of course . . . and . . . I took Jesse, Mr. Bonilla, my two sons, and then I took . . . Rocio and her husband right?

VILLEGAS:   Ah.

MIMBELA:   They were like . . . babies in a candy store. . . .

VILLEGAS:   (Laughs).

MIMBELA:   (Laughs). . . . Cause all kinds of celebrities were sitting right next to us, like Magic Johnson was there . . .

VILLEGAS:   Ah, man, are you serious?

MIMBELA:   Yeah, this was at the L.A. Coliseum . . . in L.A. . . . Ron Artest . . . Sugar Ray Leonard . . .

VILLEGAS:   Ah man (laughs).

MIMBELA:   . . . and of course . . . Oscar de la Hoya. So . . . they were like taking pictures galore . . . and afterwards we went and had a little celebration with our boxer Escalante . . . we took him out for some

50

> drinks and dinner. . . . They were with us . . . and they were having the time of their lives . . . and they said . . . "John, you gave us the ultimate experience." . . . he goes, "anything we can do for you . . . we're here for you . . . we're here with you . . . with Daniel, we're gonna stay with this until he's out of prison."

VILLEGAS:   (Laughs).

Again, as with the Williams conversations, we have no doubt that this evidence would be admissible as impeachment evidence on cross-examination if Hernandez and Medina are called to the stand, and the trial court did not foreclose that avenue of admissibility. However, purpose and the ultimate fact to be proven control our relevance analysis. *Layton*, 280 S.W.3d at 240. Here, the State wants to admit this evidence not to show that the witnesses have a bias, but substantively, during its case-in-chief, to establish Villegas' consciousness of guilt. As with the Williams conversations, we conclude the trial court, in a reasonable perception of common experience, could reasonably reject the inference of an insidious explanation for the phone calls, given the ambiguity surrounding how much control Villegas asserted over Mimbela, and the fact that interviewing witnesses while conducting a post-conviction habeas investigation is not, in and of itself, suspect. As noted, the trial court explicitly rejected the idea that Mimbela was acting as Villegas' agent based on the record presented. We overturn evidentiary rulings only when they fall outside the zone of reasonable disagreement. Because the evidence as presented is inconclusive and subject to the trial court's reasonable perception of common experience, we will not disturb the trial court's ruling. Issues 4A through 4E are overruled.

### iii.
### Rudy Flores

Writ hearing witness Rudy Flores was fifteen years old at the time of the Electric Street Shooting. He and his brother Javier were part of the Los Midnight Locos (LML) gang in Northeast El Paso. Two weeks before the Electric Street shooting that resulted in England and

Lazo's deaths, Rudy Flores allegedly threatened to kill England and Lazo at a party. And, Javier Flores had fought with Lazo at school. At the writ hearing, Villegas called several witnesses in an attempt to show that Rudy Flores was the actual perpetrator of the Electric Street shooting. Rudy Flores had previously given the District Attorney an affidavit denying any involvement in the Electric Street shooting.[19] When called to testify at the writ hearing, Rudy Flores attempted to invoke his right against self-incrimination and was held in contempt when the trial court held that Flores had waived his Fifth Amendment right by providing his affidavit to the District Attorney's Office, but Flores still persisted in refusing to answer questions.

In Issues 5A through 5G, the State seeks to admit conversations between Mimbela and Villegas related to Rudy Flores. The State asserts the actions Mimbela proposes in these conversations were an attempt to offer Rudy Flores cash in order to "pin" the Electric Street Shooting on his dead brother Javier. As with the other conversations, the State maintains that this was another attempt to tamper with a potential witness, which in turn showed Villegas' consciousness of guilt. Villegas insists that Mimbela only reached out to Rudy Flores as part of the habeas investigation, and that any mention of reward money for information was not intended to influence Flores' testimony.

### 1.
### *October 28, 2010 Recording (Issue 5A)*

On October 28, 2010, Mimbela and Villegas began discussions about reaching out to Rudy Flores:

MIMBELA:   . . . remember that I told you that he knows [Flores]?

---

[19] Rudy Flores was summoned from the prison to El Paso on a bench warrant as part of the District Attorney's post-conviction investigation. Then, with counsel present, Flores was personally interviewed by District Attorney Jaime Esparza in Esparza's office. According to testimony from Flores' attorney, Flores agreed to give an affidavit denying involvement in the Electric Street shooting. In exchange, the District Attorney's Office promised not to use the affidavit if it became apparent that offering the affidavit would result in the waiver of Vasquez's privilege against self-incrimination.

52

VILLEGAS:     Yeah.

MIMBELA:      . . . I told him. . . why don't you write [Flores] . . . you know there's a $50,000 reward, right?  Well, write [Flores] . . . let him know that we've got a $50,000 reward and that . . . we don't think it was him because . . . the new word that we're getting around . . . everybody kinda tells us the same thing, that [Flores] wasn't that kind of person.  He was a bragger . . . he really never furnish . . .or had a gun or anything like that, but . . . they're almost positive that . . . [Flores] knows something, he knows who it was . . .whether it was his brother, whether it was the LML gang . . . and like a lot of other people, he was bragging about it, but nobody believes that it was him. . . .

*2.*
*November 1, 2010 Recording (Issue 5B)*

On November 1, 2010, Mimbela and Villegas discussed what would be the best way to approach Flores:

MIMBELA:      . . . I already told you about . . . this guy . . . Chris Martinez . . . that . . . is related to Armando's mom . . . we're supposed to have lunch this week and we wanna discuss how . . . what's gonna be the best way to approach . . . [Flores] on this.

VILLEGAS:     Hmm.

MIMBELA:      . . . remember how I told you about that . . . that we're gonna try to approach [Flores] . . . and see if . . . like I said, from everybody I talked . . everybody seems to think that . . . [Flores] definitely knows something about it, but he wasn't the trigger guy . . . what's your thought?

VILLEGAS:     I don't know, if he wasn't the triggerman, hopefully he'll come out with it.  He looks like a shiesty dude.

MIMBELA:      Yeah.

VILLEGAS:     That's how he came up to me back when we were kids, being real shiesty, so . . . he probably would give somebody up for $50,000 grand, and right now he's in prison, and he's probably doing bad.

MIMBELA:      Yeah, yeah . . . .

### 3.
### *February 2, 2011 Recordings (Issue 5C)*

On February 2, 2011, Mimbela and Villegas discussed Villegas' attorney's upcoming visit to Flores in prison:

MIMBELA:   . . . Joe Spencer's gonna go visit [Flores] in prison.

VILLEGAS:  Oh, yeah? (Laughs)

MIMBELA:   Yeah, and he's gonna talk to him and deal with him.

VILLEGAS:  Alright . . . that'll be real good. (Laughs)

           *               *              *

MIMBELA:   . . . he wants to go see [Flores], and see if [Flores] is willing to cut some kind of a deal.  In fact, if he does know who did it or if he was involved.

VILLEGAS:  That sounds good.  I just hope he can get [Flores] to say it. (Laughs)

MIMBELA:   You what?

VILLEGAS:  I said I hope they can get [Flores] to talk. (Laughs).

### 4.
### *February 4, 2011 Recordings (Issue 5D)*

On February 4, 2011, Villegas told his mother Yolanda Villegas about his attorney Joe Spencer's plan to meet with Flores to see what he knew about the Electric Street shootings:

VILLEGAS:  Spencer's going to go . . . visit [Flores].

           *               *              *

YOLANDA:   (unintelligible)

VILLEGAS:  . . . they talked about, they're going to go talk to [Flores].

YOLANDA:   They talked to [Flores], or they're going to?

VILLEGAS:  They're going to . . . they're going to try to see if they can work a

54

deal out with him, maybe[.]

YOLANDA: Oh, okay . . . he had mentioned something like that to me then . . . that they were going to talk to him, tell him they knew it was "Dirt" and see if they (inaudible) the $50,000.

VILLEGAS: I don't know how they're going to bring it to him. They didn't tell me how. They just said they were going to try to holler at him, see what happens.

YOLANDA: . . . they told me that whoever . . . (inaudible) . . . that they knew that it was Dirt and that if they . . . (inaudible) . . . the gun or something, they were going to offer him the money. (Inaudible) . . . they still think that they have a good case without the – but I guess it's better for you to come out innocent. . . .

VILLEGAS: That would be the best thing because that'll clear my name.

YOLANDA: If John wants his money back, you're going to make sure he finds you innocent?

VILLEGAS: I don't know, but I better have innocence anyway. That would mean that I would have a clear record, no felony charges, no nothing. Clean –

YOLANDA: . . . we'll pay for the pardon.

### 5.
### *February 6, 2011 Recordings (Issues 5E and 5F)*

On February 6, 2011, Villegas spoke with his mother again about Flores:

YOLANDA: . . . I really feel that he's the one that did it. I don't feel it was his brother. I don't like the thought of paying someone for . . . killing people.

VILLEGAS: . . . the deal was, he really didn't have anything on him. He didn't seem like that. He seemed like a big coward to me.

That same day, Villegas and his father discussed Flores:

VILLEGAS: . . . [Flores] goes ahead and 'fesses up. (Both talking over each other).

FATHER: I don't see why he wouldn't agree to . . . what we're propositioning him with . . . Hell . . . be stupid for him not to . . . his brother's

dead anyway.

### 6.
### *February 28, 2011 Recordings (Issue 5G)*

In this recording, Villegas told his mother that Flores had refused to meet with Villegas' attorney.

These conversations are similar to the conversations we have previously discussed. Again, we conclude the trial court, in a reasonable perception of common experience, could reasonably reject the inference of an insidious explanation, given the ambiguity surrounding how much control Villegas asserted over Mimbela, and the fact that interviewing witnesses while conducting a post-conviction habeas investigation is not, in and of itself, suspect. Accordingly, we conclude that the trial court did not abuse its discretion in excluding these conversations, since their ultimate relevance for the purpose offered fell within the zone of reasonable disagreement. Issues 5A through 5G are overruled.

### iv.
### Arasally Flores and Jose Juarez

Arasally Flores is the sister of Rudy and Javier Flores. Jose Juarez is Arasally's boyfriend. Both are prospective witnesses. In Issues 6A through 6C, the State seeks to admit three conversations between Mimbela and Villegas in which Mimbela mentions reaching out to Juarez and Arasally Flores and informing them of the $50,000 reward for information. As with the previous statements, the State alleges these statements prove Villegas' consciousness of guilt and show a concerted effort to tamper with witnesses.

### 1.
### *January 28, 2010 Recording (Issue 6A)*

On January 28, 2010, Mimbela told Villegas that he had made contact with Arasally and Juarez:

56

MIMBELA:    . . . we talked to . . . Sally Flores.  You know who that is, right?

VILLEGAS:   That's . . . [Flores's] sister.

MIMBELA:    Yeah . . . we talked to her.

VILLEGAS:   Huh, what did she say?

MIMBELA:    . . . she was in a real bad motorcycle accident.

VILLEGAS:   I didn't know that.

MIMBELA:    Yeah . . . she's got . . . brain damage.

VILLEGAS:    Oh.

MIMBELA:     . . . the only thing is . . . she . . . doesn't remember a lot . . . she seems to be okay. . . .

                    *                *                *

MIMBELA: . . . we went talking to her and . . . we told her about the $50,000 reward. . . . And her boyfriend was there, right?

VILLEGAS:   Yeah.

MIMBELA:    . . . she lives where [Flores] and them used to live, that's where she lives.

VILLEGAS:   Okay.

MIMBELA:    . . . we went and talked to her and we talked to her boyfriend and we told them . . . there's a $50,000 reward out there.  We're after . . . the guy that killed these two kids. . . . the guy that they've got in prison isn't the guy, he's not the one that did it . . . we wanna . . . prove that it wasn't him, so we're offering a $50,000 reward.

                    *                *                *

MIMBELA:    . . . what I'm thinking is this . . . these people need the money . . . you can tell, they've lived in a – that house is all run-down, and . . . their cars . . . are all beat up . . . so . . . if she knows something, and if her boyfriend is . . . hating on her ex . . .

VILLEGAS:   (inaudible).

57

*2.*
*February 22, 2010 Recording (Issue 6B)*

On February 22, 2010, Mimbela relayed his second attempt to talk to Arasally Flores about the case:

MIMBELA:   . . . Lucy and I went on Saturday, we went to go visit that girl Sally Flores again.

VILLEGAS:   Yeah.

            *            *            *

MIMBELA:   . . . we talked to Sally . . . to see if there's anything she remembers, and . . . we talked to her boyfriend . . . to remind him . . . hey, there's $50,000 out there, just so you know, in Daniel's case. . . . nobody that was in that car or supposedly in that car got prosecuted so . . . don't be afraid that if somebody was in there to talk and pick up that reward, you know? . . . we're just throwing stuff out there, you know?

VILLEGAS:   Hell, yeah.  (Laughs).

MIMBELA:   (Laughs).  Yeah, I mean, who knows, somebody might be afraid to talk, that I was in the car and I'm going to be prosecuted, well . . . that didn't happen in Daniel's case, so don't be afraid. . . .

VILLEGAS:   Yeah – yep.

MIMBELA:   . . . if you were in the car and . . . you want to pick up some money, here it is. . . .

*3.*
*April 27, 2010 Recording (Issue 6C)*

On April 27, 2010, Mimbela told Villegas that he had gone to Juarez's house and spoken with his family about the $50,000 in reward money:

MIMBELA:   . . . that [Jose] Juarez guy . . . we . . . found his parents and we went to his parents' house, right?

VILLEGAS:   Uh-huh.

58

MIMBELA: . . . telling them . . . we have reason to believe your son might have some information . . . and I don't know if you guys read the article, but we are offering a $50,000 reward for anybody with information. . . .

\*               \*               \*

MIMBELA: . . . so if your son knows anything about it, or even if he was in the car, of he knows something about it . . . nothing's happening to him, they're just after the guy that pulled the trigger . . . look what happened to Daniel . . . we reassured him that . . . if the person was in the car, they can't prove that they knew anything was going to go down. . . .

VILLEGAS: Yeah. (Laughs).

MIMBELA: . . . the father seemed real convinced . . . a younger daughter was there with him, kinda listening in, and she seemed real interested in it. I showed them the paper, I showed them where the $50,000 reward is being offered.

\*               \*               \*

MIMBELA: . . . we are offering this $50,000 reward . . . this Rudy Flores, of course they know him real well because . . . remember that Juarez guy was married or had a baby with Rudy Flores' sister . . . you remember that part, right?

VILLEGAS: Yeah . . . the other part . . . he was supposed to be one of the cats in the car too . . .

MIMBELA: . . . yeah, exactly, but . . . that's why we're trying – brought in that other angle . . . we think we know . . . that he knows something . . . he might know who pulled the trigger, and there's that $50,000 reward. . . .

The State alleges these conversations show that Mimbela and Villegas offered these witnesses $50,000 in an attempt to have them fabricate favorable evidence—namely, that the deceased Javier Flores was the actual Electric Street shooter. As with the other conversations at issue in this case, we conclude the trial court, in a reasonable perception of common experience, could reasonably reject the inference of an insidious explanation, given the ambiguity

59

surrounding how much control Villegas asserted over Mimbela, and the fact that interviewing witnesses while conducting a post-conviction habeas investigation is not, in and of itself, suspect. The trial court could have also properly determined, in a reasonable perception of common experience, that Mimbela mentioned the $50,000 reward in order to genuinely see if they had exculpatory information. As the State conceded at the evidentiary hearing, offering a monetary award for information is not *per se* improper, and the State itself often offers reward money for information. Such reward money is a proper subject of examination on impeachment, but based on this record, the trial court could have properly determined that Mimbela's offer of reward money for purposes of the habeas proceeding was too attenuated to be relevant to Villegas' consciousness of guilt for a crime committed in 1993. Again, we will defer to the trial court's resolution of reasonable inferences here under the abuse of discretion standard. Issues 6A through 6C are overruled.

## v.
## David Rangel

David Rangel is the cousin of Daniel Villegas. During his interview with police, Rangel told the investigating detective that Villegas had told him he shot England and Lazo with a shotgun. However, Rangel also testified that he believed from his tone that Villegas was obviously joking. Rangel later testified at the writ hearing that he told the detective that he believed that Villegas' "confession" was just a joke, but that when he said that, the detective stopped taking his statement, threw away the statement he had been typing for Rangel, and threatened him. The State insists that this testimony regarding the detective's threats is false, and that Rangel did not mention Villegas joking about the shooting in his official statement.

In Issues 8A through 8D, the State seeks to admit the following statements Villegas made concerning conversations he had with Mimbela and his mother Yolanda concerning Rangel. The

State believes that these recordings show that Villegas was not joking or bragging when he told Rangel that he had shot Lazo and England, and that contrary to his statements to police, Rangel did not believe Villegas was joking, either.

*1.*
*September 13, 2010 Recording (Issue 8A)*

In this recording, Mimbela relayed a conversation he had with Rangel to Villegas:

MIMBELA:  . . . "a lot of people blame me (Rangel) for it . . . once in a while . . . [Yolanda] would blame me for it . . . I just told the truth . . . the truth is, Daniel did tell me this . . . and I told the truth, but they did not write what I told them.  They threw that one away, and they wrote whatever they wanted to write, and then they scared me into signing it."

VILLEGAS:  Yeah.

*2.*
*September 17, 2010 Recording (Issue 8B)*

In this recording, Villegas told his mother Yolanda:

" . . . they said that little David [Rangel] was crying on the phone . . . that he was telling him . . . that he was glad this almost gonna be over with . . . he feels bad about it, he says . . . we all blame him for it . . . he said you blamed him a couple of times."

*3.*
*September 17, 2010 Recording (Issue 8C)*

Later on in the day on September 17, 2010, Villegas told his mother that he had written Rangel a letter forgiving him for what happened:

VILLEGAS:  I wrote him – I wrote him a letter though.  I let him know . . . he ain't about nothing . . . ain't nothing to apologize about either cause we were all a bunch of kids back then . . . it's a done deal.

YOLANDA:  Done deal?  Okay.

*4.*
*September 9, 2013 Recording (Issue 8D)*

61

In a phone call on September 9, 2013, Villegas expressed frustration with his cousin Rangel:

> VILLEGAS: It's just like, somebody can always prove themselves that they aren't going to fuck you over and then one day they just they they [sic] fucking turn on you. . . . Who ever thought my fucking cousin David and all these people, I trusted them with my life?

The State maintains that these statements corroborate the original statement Rangel gave police and show he did not believe Villegas was bragging or joking about the Electric Street shooting. To the contrary, we find that these statements do little if anything to illuminate Rangel's state of mind or to corroborate the State's claim that Rangel believed Villegas was not joking when he said he shot Lazo and England with a shotgun. Simply put, the State asked the trial court to draw too attenuated an inference between these statements and the purpose for which they are offered. To meet the relevancy threshold, the link between the evidence and its ultimate purpose must be direct or logical. *Layton*, 280 S.W.3d at 240. We do not see the direct or logical link from these conversations. Given this lack of nexus, we cannot say the trial court abused its discretion by excluding these conversations from trial. Issues 8A through 8D are overruled.

### 3.
### *Evidence of a Silence Pact*

In Issues 7A through 7C, the State maintains that the trial court erred by excluding certain calls in which Villegas allegedly suggests that Rodney Williams was in the car with him the night of the shooting, and that the two had a silence pact to protect each other. The State also argues that the calls show Mimbela attempted to tamper with Rodney Williams as a potential witness by offering him gifts. Because the individual statements are offered for differing purposes, we will break up our discussion accordingly and examine each statement individually.

62

### *February 25, 2011 Recording (Issue 7A)*

In Issue 7A, the State seeks to admit the following excerpt of a conversation Villegas had with his mother regarding Rodney Williams:

VILLEGAS:  [H]e made an oath.  That's not a favor, that's a oath he made.  You gotta fulfill the oath.

YOLANDA:  . . . what did you tell him in the letter?

VILLEGAS:  I told him he gotta get on the ball. . . . Shit, man, the whole time I've been away rotting and shit in the damn penitentiary, I never asked them for a damn thing.  Them over there, you and Marcos have been living it up . . . with your family.  I've been stuck in here, you all forgot about me.  (Inaudible) . . . memory.  I wanna get out there too like you all. . . . I tell them . . . the victims are on our side, they're willing to go to court and everything. . . and we don't even know these guys. . . . You're somebody I grew up with.  And you're catching that shit. . . . I won't accept it. . . I said we made an oath, and you're going to keep it.  This shit ain't over with yet. . . . You were there when . . . all the odds were against us . . . now you want to cash out on me. . . . I'm not buying that, that's not going to happen.  I didn't mean to bitch him out too bad, I just kinda snapped him back to it.

In Issue 7A, the State argues that this conversation is proof that Villegas and Rodney Williams were not only in the car together during the Electric Street shooting, but that they had some sort of silence pact or mutual agreement to not abandon each other, which Villegas was upset with Williams for violating.  We believe this to be an overstatement of what may be logically inferred from this evidence.  Read in isolation, this conversation and Villegas' statements are equivocal, and even when we consider this statement in the context of the case, we struggle to see how the trial court abused its discretion by determining this conversation was irrelevant.  Pieces of the logical chain between this conversation and its ultimate evidentiary purpose appear to be missing, and we cannot fault the trial court for excluding this evidence.  Issue 7A is overruled.

In this recording, Yolanda told Villegas that Mimbela had burned a "tough-love" letter Villegas attempted to send to Williams. Villegas replied that she did not understand the "guys from the street" and the "philosophy of trying to get people from the street to do what you want. . . ." The State insinuates that Mimbela burned the letter because it contained inculpatory statements and he was trying to destroy evidence to protect Villegas. Because the conversation at issue in this recording is so brief, there is little information supporting the State's contention, rendering its argument speculative. Considered in conjunction with the conversation in Issue 7B, this information could arguably support some sort of spoliation inference, but not the one State advances. The evidence is so weak that we cannot say the trial court abused its discretion by excluding it. Issue 7B is overruled.

*c.*
*December 13, 2011 Recording (Issue 7C)*

On December 13, 2011, Mimbela recounted taking Rodney Williams to a Dallas Cowboys game:

> MIMBELA: . . . we had a great time at the game. . . . I told you invited Rodney, right?
>
> VILLEGAS: No, but my mom was telling me the other day . . . that you guys had invited them.
>
>        \*            \*            \*
>
> MIMBELA: . . . they met up with us in the hotel – five of them. . . .
>
> VILLEGAS: Ah.
>
> MIMBELA: . . . they had a blast, they were like two kids in a candy store.
>
> VILLEGAS: (Laughs).

This conversation presents the same problem we have analyzed with respect to other witnesses. The State may explore the impeachment value of the gifts Mimbela gave on cross-examination, and certainly, a reasonable person could view the type, amount, and monetary value of incentives Mimbela offered to various witnesses with a healthy degree of skepticism. Yet, the trial court, in a reasonable perception of common experience, could have rejected any nefarious inference and instead viewed this evidence as Mimbela's bona fide attempts to help Villegas vindicate his innocence, or evidence that Mimbela acted of his own accord and not according to Villegas' control. We discern no abuse of discretion in the trial court excluding this evidence as irrelevant. Issue 7C is overruled.

*4.*
*Efforts to Tamper with Judge*

Finally, we address the State's argument that Villegas attempted to compromise judicial officers in a concerted effort to manipulate his chances of success in his habeas corpus proceedings. In Issues 9A, 9B, and 9C, the State asserts that the trial court abused its discretion in excluding conversations related to Mimbela's attempt to initiate ex parte communications with Judge Mary Anne Bramblett, who presided over Villegas' 1995 trial and who was initially assigned to Villegas' habeas case. In brief, during the lead-up to his habeas corpus petition, Villegas received a letter of support from then-Congressman Silvestre Reyes. The three conversations at issue involve Mimbela informing Villegas about his attempts to bring the Reyes Letter to Judge Bramblett's attention.

**a.**
**February 8, 2010 Recording (Issue 9A)**

On February 8, 2010, Mimbela first informed Villegas of his plan to get Judge Bramblett to read the letter of support authored by Congressman Reyes:

MIMBELA: . . . we're gonna introduce it to [Judge Mary Anne Bramblett] in a different way – we're gonna see if we can get somebody . . . a good friend of hers or somebody to show it to her, or I talked to my buddy, that probation officer, that one that got me in contact with . . . Detective Marquez . . . and talking to him . . . he suggested that we . . . give that letter to her husband. Because we can't give like directly to her because then it would be like we are trying to influence her.

VILLEGAS: Yeah.

MIMBELA: . . . we go to be diplomatic about it . . . like I say . . . give it to somebody she knows and they can show it to her because they know they're . . . doing it like off the record. You know what I'm saying?

VILLEGAS: Yeah.

MIMBELA: . . . cause we don't want nobody to try to say that – accuse us of buy-out the judge . . .

VILLEGAS: Like bribing her.

MIMBELA: Yeah, exactly, like bribing her or whatever so what we're gonna do is like I said, we're gonna go ahead . . . and this guy knows – her husband's a lawyer, I don't know if you knew that . . . Anne Bramblett's husband.

VILLEGAS: Yeah, you were telling me.

*     *     *

MIMBELA: . . . we're gonna try to . . . go play some golf and then we're going to give him the letter so that he can give it to Anne Bramblett.

**b.**
**February 22, 2010 Recording (Issue 9B)**

On February 22, 2010, Mimbela updated Villegas about his attempt to reach out to Judge

Bramblett's husband:

MIMBELA: . . . to give you an update . . . we got a hold of . . . remember I told you we were trying to get a hold of Anne Bramblett's husband?

VILLEGAS: Yeah.

66

MIMBELA: . . . well my buddy got a hold of him . . . last week but he was out of town. But anyway, he's gonna be back in town about Wednesday.

VILLEGAS: Uh-huh.

MIMBELA: And he's supposed to give him a call and . . . see if we can get together. . . .

         *            *            *

MIMBELA: . . . what I did is I . . . gave my friend there, I gave him a little bit of the writ . . .

VILLEGAS: Uh-huh.

MIMBELA: . . . like the first few pages where it explains . . . all the witnesses that Gates didn't call up . . . I gave him a copy of that so when he gets to town . . . he's going to go over that with him on the phone . . . and then see . . . show him that letter from [Congressman] Silvestre Reyes . . . and see . . . if he agrees with what we're doing and see if he will give that letter to his wife to see if she's gonna be interested in trying . . . to help us with this stuff . . . that's where we're at with that. . . . we're either gonna just meet or maybe go do the golf thing, or maybe just him. Anyway, he's supposed to do that probably this Wednesday or Thursday when he gets back into tow.

VILLEGAS: Hell, yeah . . . sounds good.

The State notes that three days after this jail recording, Judge Bramblett voluntarily recused herself from the case, stating that she had "received information" that would create a perception that she could not be impartial. Villegas denies that Judge Bramblett's self-recusal is related to the events recounted in this phone call.

### c.
### May 3, 2010 Recording (Issue 9C)

In this recording, made after Judge Bramblett recused herself, Mimbela told Villegas about a conversation he had with a probation officer who allegedly had originally suggested

reaching out to Judge Bramblett indirectly. According to Mimbela, the attorney who had represented Villegas in his original trial had approached the probation officer, asked how Villegas and his team managed to have Judge Bramblett removed from the case, and then stated that having Judge Bramblett off the case was the best thing that could have happened to Villegas.[20] When Mimbela relayed this information to Villegas, both he and Mimbela laughed, and then Mimbela stated: "Anne Bramblett—it don't matter how fair she wanted to be, or how fair she is, I think she already had her mind set on this. . . . " Villegas agreed.

We do not condone Mimbela's attempts to communicate with Judge Bramblett ex parte. It is clear from these conversations that at the very least, Mimbela and Villegas knew Mimbela was skirting a line by attempting to bring the Reyes Letter to Judge Bramblett's attention. Whether Mimbela's actions were proper, ethical, or strictly legal is not the question before the Court. The question we must answer is whether the trial court abused its discretion in excluding these conversations from the jury's consideration in Villegas' upcoming trial.

Judge Ables, who considered this particular evidentiary issue, stated that he believed the evidence did not support an inference that Mimbela and Villegas were attempting to "tamper" with Judge Bramblett. He noted that while ex parte communications are prohibited, he personally nevertheless had experienced litigants or other people unrelated to the case attempting to contact him and express their earnest opinions, without realizing such outreach attempts are improper. He opined that he did not believe the record supported an inference that Mimbela and Villegas had the intent to tamper with Judge Bramblett, or that the outreach attempt supported an inference that Villegas knew he was guilty of the Electric Street shooting. We agree with Judge Ables that such an inference may not be supported by the evidence. In light of the equivocal

---

[20] We note that this statement involves triple hearsay—Mimbela (first level) relays a story from the probation officer (second level) about comments made by Attorney Olivas (the third level).

68

nature of this evidence and its relative attenuation from the ultimate question of Villegas' guilt, we will defer to the trial court's relevancy determination. We do not believe the trial court abused its discretion in determining that the conversations and the events they recount are irrelevant.

But even if we are incorrect in our assessment, and the conversations meet the Rule 401 relevance standard as a matter of law, from a Rule 403 balancing perspective, this conversation is equally as problematic as Villegas' purported admission of guilt addressed in Issue 2A. The probative value of these actions as a basis for an inference of guilt is limited at best. Further, although the confession Villegas gave the investigating detective is no longer in play, the State's need for this evidence is not as great as the other statements the State has sought to admit. And, as with Issue 2A, substantial prejudice factors are present. Without context, the jury would not understand why Mimbela's attempt to get Judge Bramblett to read the Reyes Letter would be relevant, and could possible lead the jury to speculate and decide the case on improper grounds. Further, placing the actions in context would require an explanation of post-conviction habeas proceedings, which would expend time and resources and would potentially confuse jurors. Additionally, explaining what habeas corpus proceeding involve would necessarily risk exposing the jury to the highly prejudicial fact that Villegas had been found guilty and was incarcerated for the same crime. Indeed, under these circumstances, admission of these statements may be even more prejudicial given that Judge Bramblett presided over both the habeas corpus proceedings and the original trial.

Our opinion today should not be read as foreclosing the use of prison recordings like these by the prosecution. In other cases, the probative value of the statements and the State's need for them may very well outweigh the potential prejudice that comes with explaining post-

conviction proceedings to a jury. But that is not the case with the evidence before us. The State seeks to admit this evidence for a specific purpose, and we must tie our analysis directly to the State's specific purpose. Our fidelity to the standard of review, and our concomitant reluctance to supplant the trial court's judgment with our own under that standard when it comes to questions of relevance and prejudice, counsels the result today. The trial court's balancing of Rule 403 factors is entitled to our deference. In light of the arguments and evidence presented, we cannot say that the trial court abused its discretion in excluding this information from the jury. Issues 9A through 9C are overruled.

### III.
### One Final Note

We close with a brief coda. Our opinion in this interlocutory appeal, as with any case on interlocutory review, is based on a snapshot of the record taken at a particular period of time before trial begins. We affirm the order of the trial court today because, based on our review, the trial court had the discretionary authority to rule on these issues pretrial, and because the trial court did not act arbitrarily or without reference to guiding principles in rendering its substantive decisions.

That being said, evidentiary rulings are protean, and the calculus can always change. A trial court can reconsider or revise its ruling on a pretrial motion to suppress any time before the close of trial. *See Davis*, 2016 WL 4126020, at *5. We also note that while the trial court excluded this evidence for the particular offered purposes, it did not rule on other possible bases for admission. Further development of the record at trial may furnish missing predicates, fill in inferential gaps, or render otherwise inadmissible evidence relevant or admissible for another purpose. However, the trial court's evidentiary rulings will stand for now, because we are powerless to intervene absent an abuse of discretion. How the State moves forward in light of

70

our decision, and how the trial court will come to view these evidentiary rulings in the dynamic context of trial, are matters beyond our purview.

## CONCLUSION

The State has not demonstrated the trial court abused its discretion. Accordingly, we affirm the trial court's "Order Regarding State's Designated Phone Calls."


                                        STEVEN L. HUGHES, Justice

December 21, 2016

Before McClure, C.J., Rodriguez, and Hughes, JJ.

(Publish)